**SIX TWENTY–NINE PRODUCTIONS, INC., Appellant,**

v.

**ROLLINS TELECASTING, INC., d/b/a Station WEAR–TV, Channel 3, Pensacola, Florida, Appellee.**

No. 22624.

United States Court of Appeals
Fifth Circuit.

Aug. 30, 1966.

W. A. Swann, Jr., Pensacola, Fla., for appellant.

Bert Lane, Beggs, Lane, Daniel, Gaines & Davis, Pensacola, Fla., for appellee.

Before WISDOM and COLEMAN, Circuit Judges, and HUGHES, District Judge.

HUGHES, District Judge.

This case presents the question of whether a television station's refusal to accept filmed commercials submitted by an advertising agency on behalf of its clients, payment for which would be made by the station on a commission basis, constitutes a violation of the federal antitrust laws.

Appellant, Six Twenty-Nine Productions, Inc., hereinafter called plaintiff, in a suit against appellee, Rollins Telecasting, Inc., d/b/a WEAR-TV, Pensacola, Florida, hereinafter called defendant, alleged a violation of Sections 1 and 2 of the Sherman Act,[1] and prayed for an injunction and treble damages under Section 4 of the Clayton Act.[2]

Both parties filed motions for summary judgment based upon the pleadings, affidavits and depositions on file. The District Court denied the plaintiff's motion and sustained the defendant's motion. The plaintiff appeals that judgment.

---

1. 26 Stat. 209 (1890), as amended, 15 U. S.C. §§ 1 & 2.

2. 38 Stat. 731 (1914), 15 U.S.C. § 15 which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Plaintiff is a general advertising agency in Pensacola, Florida. In December 1963, the plaintiff added to its services the preparation of commercial advertising for television broadcasting. Defendant, the only TV station with studios located in Pensacola, broadcasts into portions of Florida and Alabama through a transmitter located in Alabama. Commercials aired by the defendant were prepared by both the station and an agency. If the client chose an agency and the defendant agreed to accept the agency's product, a fifteen per cent commission was paid the agency.

During 1963 Crestview Mobile Homes, Inc., bought about $20,000 in advertising directly from the defendant station. In 1964 Crestview employed plaintiff as its advertising agency. This suit arose from the refusal of the defendant to recognize the plaintiff as a qualified agency following its attempt to place advertising for Crestview with the defendant.[3]

This appeal presents two questions: (1) whether the allegations of the complaint are sufficient to state a cause of action for violation of Sections 1 or 2 of the Sherman Act, and (2) if the complaint is sufficient, whether there are disputed material issues of fact to be determined.

Included in the allegations of the complaint are the following:

1. The Federal Communications Commission had allocated one commercial television channel to Pensacola, Florida, and had licensed defendant station to operate on this channel. No other television station broadcasts from Pensacola into the Pensacola market. By virtue of this license the defendant enjoyed a monopoly to broadcast on channel 3.

2. At the time the plaintiff commenced its operation there were three active licensed advertising agencies in Pensacola. Defendant recognized each of these agencies and allowed an agency commission of 15% on any advertising placed on its Station by such agencies. This was generally the practice in the advertising industry.

3. At that time the defendant had not adopted any standards for determining whether to recognize an advertising agency nor had the Station required any advertising agency which it recognized to meet any specific requirements.

4. On January 10, 1964, Crestview Mobile Homes, Inc., employed the plaintiff to handle all advertising for the company. Crestview had not previously employed an agency. Its advertising had been handled by various news media, including the defendant.

5. Immediately after Crestview hired the plaintiff as its agency, the plaintiff gave defendant notice of its employment. A representative of the Station thereupon informed the plaintiff that it would not pay it a commission and the only local agency it would recognize was Dodson, Craddock and Born, Inc. Plaintiff was also informed by a station representative that the Station had set aside one million dollars to put the agency out of business.

6. On January 20, 1964, the manager of the defendant told the president of Crestview Mobile Homes that the plaintiff was not a qualified agency, that Crestview's rates would be higher if they used the agency, and that the Station would not recognize plaintiff as an agency. On January 21, 1964, a meeting was held by the manager of the defendant, the president of Crestview Mobile Homes, and the president of Dodson, Craddock and Born, at which the defendant's manager attempted to influence the president of Crestview to drop plaintiff as its agency and employ Dodson in its place.

3. The defendant was willing to accept the advertising but refused to pay the usual 15% commission. However, in the context of the alleged facts of this case, a refusal to pay the commission is for practical purposes a refusal to do business with the agency.

7. On January 21, 1964, plaintiff received two letters from the defendant, one containing certain standards which had purportedly been adopted for the recognition by the Station of an advertising agency and the other informing the plaintiff that the Station would not recognize it as an advertising agency. The standards it adopted included such items as gross minimum billing of $300,000 per year, a minimum of three full time employees, a minimum bank balance of $7500, and a minimum of five representative accounts.

8. By letter of January 22, 1964, Crestview terminated the plaintiff's employment as its advertising agency, and within 14 days Crestview employed Dodson.

9. Other advertisers with whom plaintiff was negotiating were told by the defendant that the Station would not handle any advertising at its regular rates if the plaintiff was used as its agency.

10. Defendant paid commissions to other local and out of town agencies which did not meet the standards set forth in the defendant's January 21, 1964, letter to plaintiff.

11. The relationship between advertisers and defendant and between advertisers and plaintiff required and resulted in a continuous commercial intercourse across state lines.

The complaint further alleged that the standards set up by the defendant were for the express purpose of preventing the plaintiff from engaging in the business of an advertising agency and served to destroy competition by plaintiff and in fact rendered transaction of business by plaintiff impossible.

A review of the provisions of the Sherman Act and the cases interpreting it leads us to the conclusion that the complaint states a cause of action under both Sections 1 and 2 of the Act.

Section 2 of the Sherman Act dealing with monopolies provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

■ The principal contention of the defendant is that a business has an unrestricted right to refuse to make a purchase, or in the context of this case, to purchase advertising from the plaintiff advertising agency.[5] This theory is no doubt based on the early leading antitrust case of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). In that case, a unanimous Supreme Court declared:

"The purpose of the Sherman Act is * * * to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." 250 U.S. at 307, 39 S.Ct. at 468.

While the right to refuse to purchase was here upheld, the Court did so only "[i]n the absence of any purpose to create or maintain a monopoly".[6] Even

---

5. See generally Fulda, Individual Refusal to Deal: When Does Single-Firm Conduct Become Vertical Restraint?, 30 Law & Contemp.Prob. 590 (1965); Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847 (1955); Att'y Gen. Nat'l Comm. Antitrust Rep. 132–37 (1955); Buxbaum, Boycotts and Restrictive Marketing Arrangements, 64 Mich.L.Rev. 671 (1966).

6. See also Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911, 914 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); Ace Beer Distrib., Inc. v. Kohn, Inc., 318 F. 2d 283 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1964); Parmelee Transp. Co. v. Keeshin, 292 F.2d 794 (7th Cir.), cert. denied,

in *Colgate* there is no indication that business has an unrestricted right to deal with whomever it pleases. In more recent cases the Supreme Court has firmly established the principle that Section 2 of the Sherman Act prohibits an enterprise from refusing to deal with another business entity when this course of action is undertaken in furtherance of monopolization of the relevant market.

A significant Supreme Court case in this area is Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). In that case the only newspaper in Lorain, Ohio, responded to the opening of a new radio station in the community by refusing to accept advertising from local merchants who also advertised on the new radio station. The Supreme Court held that the defendant's refusal to buy was an illegal attempt to monopolize the dissemination of news and advertising. Justice Burton declared for the Court:

> "Assuming the interstate character of the commerce involved, it seems clear that if all the newspapers in a city, in order to monopolize the dissemination of news and advertising by eliminating a competing radio station, conspired to accept no advertisements from anyone who advertised over that station, they would violate §§ 1 and 2 of the Sherman Act. * * * It is consistent with that result to hold here that a single newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." 342 U.S. at 154, 72 S.Ct. at 186.

Another significant pronouncement of the Supreme Court in this area is that of Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In that case the assignee of a dissolved corporation that

had operated a Milwaukee television station sued the Columbia Broadcasting network under Section 4 of the Clayton Act to recover treble damages for alleged violations of Sections 1 and 2 of the Sherman Act. Poller alleged that the network cancelled the local station's affiliation with the network and purchased a competing Milwaukee television station, pursuant to a conspiracy to restrain and monopolize trade in the television broadcasting business. The District Court had granted the defendant's motion for summary judgment on the theory that the network had the right to cancel its affiliation contract with the local station and to purchase a competing station with F.C.C. approval. The Supreme Court reversed the judgment for the defendant and remanded the case for trial. Writing for the Court, Justice Clark stated:

> "It may be that CBS by independent action could have exercised its granted right to cancel WCAN's affiliation upon six month's notice and independently purchased its own outlet in Milwaukee. However, if such cancellation and purchase were part and parcel of unlawful conduct or agreement with others or were conceived in a purpose to unreasonably restrain trade, control a market, or monopolize, then such conduct might well run afoul of the Sherman Law. * * * A conspiracy is alleged to restrain trade in the Milwaukee television market; to eliminate WCAN from that market; to secure its facilities at depressed prices; and to occupy the UHF band in that market exclusively. The right to cancellation was merely one of the means used to effectuate this conspiracy." 368 U.S. at 468–469, 82 S.Ct. at 488.

The case most closely analogous to the present one is Packaged Programs, Inc. v. Westinghouse Broadcasting Co., 255 F.2d 708 (3d Cir. 1958). In that case

368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961); United States v. Klearflax Linen Looms, 63 F.Supp. 32, 39 (D.Minn.1945);

Arzee Supply Corp. of Conn. v. Ruberoid Co., 222 F.Supp. 237 (D.Conn.1963); Fulda, supra note 5, at 597.

the defendant owned the only television station in Pittsburgh, Pennsylvania, and thereby enjoyed a lawful monopoly of the airwaves in certain parts of Pennsylvania, Ohio, and West Virginia. In addition, the defendant engaged in the business of producing filmed programs for sale to advertisers for transmission over the defendant's television station. The plaintiff, Packaged Programs, Inc., also produced films for sale to advertisers. Packaged Programs brought a suit alleging that Westinghouse violated Sections 1 and 2 of the Sherman Act in that it had refused to schedule any filmed programs on its television station that had been produced by the plaintiff. The District Court dismissed the action and the Third Circuit reversed.

The following language appears in the opinion of Judge Hastie:

"The only other point that requires discussion at this preliminary state of the litigation is whether the admitted fact that Westinghouse enjoyed a lawful monopoly of telecasting refutes or negates the charge that its power as telecaster has been used to create monopoly in violation of the anti-trust laws. In numbers of situations the existence of lawful monopoly powers has failed to protect the monopolist in some related but additional restraint of trade. * * * In United States v. Griffith, [334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948)], the Court made this observation: 'A man with a monopoly of theatres in any one town commands the entrance for all films into that area. If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors. * * *

[This] is * * * a misuse of monopoly power under the Sherman Act. If monopoly power can be used to beget monopoly, the Act becomes a feeble instrument indeed.' 334 U.S. at pages 107, 108, 68 S.Ct. at page 945. The point thus made as to a geographic expansion of monopoly of a single business applies with at least equal force to the presently alleged effort to monopolize a different, if related, business." 255 F.2d at 710.

The similarity between *Packaged Programs* and the pending case is considerable. Both cases involve a licensed broadcaster that has monopoly power as the exclusive licensee of a particular television channel, and in addition as the only television outlet in the vicinity. A further similarity lies in the fact that both Westinghouse and WEAR-TV were engaging in an advertising production business on the side in competition with other advertising agencies. The theory of both cases is that the television stations used their legal monopoly power to create monopoly power in a separate but related field in which a monopolistic regulated industry is not the national policy.[7]

The principles enunciated in these three cases demonstrate that plaintiff has stated a cause of action under Section 2 of the Sherman Act. It is clear that the complaint is sufficient if the refusal of defendant to accept advertising from plaintiff by setting up unreasonable standards or by adopting an arbitrary course of action is for the purpose of destroying plaintiff as an agency and thereby furthering a course toward monopolization.

The next question to determine is whether a cause of action is stated under Section 1 of the Sherman Act. This section dealing with contracts of

7. See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); United States v. Klearflax Linen Looms, 63 F.Supp. 32 (D.Minn. 1945); Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 194 F.2d 484 (1st Cir.), cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952); Poster Exchange Inc. v. National Screen Service Corp., 362 F.2d 571, at 574 (5th Cir. 1966).

conspiracies in restraint of trade provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal  *  *  *."

■ The essential element in a Section 1 violation, not found in Section 2 cases, is the existence of some kind of contract, combination or conspiracy. It is fundamental that at least two independent business entities are required for violation of Section 1, while one alone is sufficient under Section 2.

In this case the plaintiff agency makes a general allegation that the defendant Station is engaged in a combination or conspiracy with another advertising agency for the purpose of eliminating plaintiff as a competitor in the field of advertising services. It is specifically alleged that on January 21, 1964, a meeting was held by the manager of Television Station WEAR-TV which was attended by the president of Crestview Mobile Homes and the president of Dodson, Craddock and Born, Inc. At the meeting the manager of the Station attempted to influence the president of Crestview Mobile Homes to drop the plaintiff as its agency and to employ Dodson, Craddock and Born in its place. Later Crestview did terminate its contract with plaintiff and hired Dodson as its agency.

No formal agreement between the Station and Dodson is alleged. The plaintiff appears to rely on joint and collaborative action on the part of the Station and Dodson in restraint of trade by eliminating the plaintiff as a competitor of both the Station and Dodson.[8] The purpose of the alleged joint action is clearly set out in the complaint.

The most recent analysis of the scope of Section 1 in a situation in which a vertical restraint of trade was present is United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In this case the General Motors Corporation and three associations of Chevrolet dealers in the Los Angeles area were found liable for damages under Section 1 of the Sherman Act for conspiring to eliminate discount houses that sold Chevrolets in the Los Angeles area.

■ Writing for eight of the nine members of the Court, Justice Fortas described this action as

"a classic conspiracy in restraint of trade: joint, collaborative action by dealers, the  *  *  *  associations, and General Motors to eliminate a class of competitors by terminating business dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose." 384 U.S. at 140, 86 S.Ct. at 1327–1328.

Relying on the line of cases that established the principle that a group boycott is *per se* illegal under Section 1,[9] and noting in particular the holding of Klor's, Inc. v. Broadway-Hale Stores,

8. The concept of agreement as an element in a Section 1 violation is extensively analyzed in Turner, The Definition of Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655 (1962).

9. Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L. Ed. 1490 (1914). See also Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

See generally Barber, Refusals to Deal under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847 (1955); Buxbaum, Boycotts and Restrictive Marketing Arrangements, 64 Mich.L.Rev. 671 (1966); Att'y Gen. Nat'l Comm. Antitrust Rep. 132–34 (1955).

Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed. 2d 741 (1959), that a group boycott of even a single trader violated the statute, the Court concluded

"that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. * * * Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be directed—as in Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n, 312 U.S., [457], at 468, 61 S.Ct., at 708." 384 U.S. at 146–147, 86 S.Ct. at 1331.

The *General Motors* case is the culmination of a consistent pattern of strong enforcement by the Supreme Court of Section 1 in cases involving agreements or combinations to refuse to deal with an outside party.[10]

The criteria enunciated in *General Motors* for bringing a case within the prohibitions of Section 1 of the Sherman Act are pertinent to the analysis of the alleged conspiracy and the joint action of the Station and Dodson to eliminate plaintiff agency. It is therefore our opinion that the complaint states a cause of action under Section 1 of the Sherman Act.

Finally, we must determine whether there are any material disputed fact issues that can only be resolved by a trial on the merits.

It is pertinent to point out that since this is an appeal from entry of summary judgment for the defendant Station, the Court must view the record in a light most favorable to the plaintiff agency.[11]

In connection with the use of summary judgment in antitrust cases, the Supreme Court recently declared:

"We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' " Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).[12]

An examination of the pleadings in the present case reveals that many of the plaintiff's material allegations have been denied, particularly those relating to fact questions not provable by documentary evidence.

Perhaps the most important fact issue is the intent and motive for the actions of the representatives of the parties involved. In the Section 2 violation the plaintiff agency must establish that the defendant Station's motivation was essentially to secure a monopoly status for itself whether in the immediate or distant future. In the

10. See cases cited in note 9, supra.

11. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

12. See also Wright, Federal Courts § 99, at 386–87 (1963). But see White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), where the Supreme Court gave limited approval to the use of summary judgment in antitrust litigation whose outcome turned principally on documentary evidence. Cf. Federal Trade Commission v. Dean Foods Co., 384 U.S. 597, 630, 86 S.Ct. 1738, 1756, 16 L.Ed.2d 802 (1966) (Fortas, J., dissenting).

Section 1 violation an agreement or conspiracy in restraint of trade between the defendant Station and the Dodson agency again depends to a large extent on the interest and motive of the parties. This fundamental issue must be determined both from what transpired and from what was said.

Standards for agency recognition go to the heart of the alleged Section 2 violation.[13] The question of their reasonableness is a key factor in determining whether the Station had the intention of eliminating the competition of the plaintiff agency. If these standards are found to be unreasonable, this finding would have a direct bearing on plaintiff agency's contention that the Station was attempting to monopolize the production of television advertising in the relevant market.

Another of plaintiff's allegations, denied by the Station, that the Station had set aside one million dollars to put the plaintiff out of business goes directly to the question of motive.

In regard to plaintiff's Section 1 charge, the allegations pertaining to the meeting attended by representatives of the Station, Crestview Homes, and the Dodson agency are the heart of plaintiff's case. The question is not merely what sort of arrangement the Station may have had with the Dodson agency, but it also may be important to consider any relationship that Crestview and the Station may have established.

While additional questions of fact will no doubt arise at the trial of this case, we believe these examples are sufficient to demonstrate that summary judgment is not the proper procedure for disposing of this case.

For the reasons stated, the judgment is accordingly reversed and the case is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

13. According to the plaintiff's complaint, the plaintiff was licensed by the State of Florida, the County of Escambia, and the City of Pensacola as an advertising agency. (Complaint ¶ 22.)