404 F.2d 1008
 NORFOLK MONUMENT COMPANY, Inc., Appellant,
v.
WOODLAWN MEMORIAL GARDENS, INCORPORATED, et al., Appellees.
NORFOLK MONUMENT COMPANY, INC., Appellee,
v.
WOODLAWN MEMORIAL GARDENS, INC., Appellee,
NORFOLK MONUMENT COMPANY, Inc., Appellee,
v.
PRINCESS ANNE MEMORIAL PARK, INCORPORATED, and Rosewood
Memorial Park, Incorporated, Appellants.
 Nos. 12230-12232.
 United States Court of Appeals Fourth Circuit.
 Argued June 19, 1968.
Decided Nov. 14, 1968.
 
 Howard I. Legum, Norfolk, Va. (Fine, Fine, Legum & Fine, Norfolk, Va., on brief), for appellants.
 Michael E. Bowerman, Bernard Glasser, Norfolk, Va., and Robert H. Patterson, Jr., Richmond, Va. (McGuire, Woods & Battle, Richmond, Va., Clyde W. Cooper, Jefferson B. Brown, Portsmouth, Va., and Wm. C. Worthington, Norfolk, Va., on brief), for appellees.
 Before BRYAN, WINTER and CRAVEN, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge:
 
 
 1
 An antitrust combination and conspiracy, 15 U.S.C. 1, 2, 15 and 26, are charged by Norfolk Monument Company, Inc. to certain incorporated cemeteries in the Norfolk, Virginia area and also against the two defendants, Jas. H. Matthews & Co., Pennsylvana and Virginia corporations, respectively parent and subsidiary. The Matthews manufacture and sell bronze grave markers throughout the United States. Complainant is a retailer in Norfolk of burial stones and plaques.
 
 
 2
 The accusation is that for 'many years' prior to the commencement of this suit, December 16, 1965, the defendants by agreement and concerted action have restrained the production, sale and distribution of such items, and have monopolized and attempted to monopolize interstate trade and commerce therein. Upon respondents' motion the suit was dismissed in summary judgment. We affirm.
 
 
 3
 The inimical conduct ascribed to the defendants in the complaint is this:
 
 
 4
 '15. Defendants Matthews, Pennsylvania and Matthews, Virginia have prepared, and the co-conspirators Woodlawn, Rosewood, Greenlawn, Roosevelt and Princess Anne have adopted, various restrictive devices to prevent, restrict and discourage sales of markers by plaintiff for installation in the cemeteries operated by the co-conspirators Woodlawn, Rosewood, Greenlawn, Roosevelt and Princess Anne. These restrictions include, but are not limited to, the following:
 
 
 5
 '(a) A requirement that all markers installed in the cemeteries operated by the co-conspirators Woodlawn, Rosewood, Greenlawn, Roosevelt and Princess Anne conform to a specific minimum bronze alloy formula, said formula being the identical minimum formula used by defendant Matthews, Pennsylvania in its manufacture of markers;
 
 
 6
 '(b) A requirement that each marker not purchased from the cemeteries Woodlawn, Rosewood, Greenlawn, Roosevelt and Princess Anne, where the marker is to be installed, be accompanied, at a substantial cost, by a certificate of analysis, prepared by an independent laboratory, attesting to the bronze alloy content of said marker; and
 
 
 7
 '(c) The assessment of an excessive and unreasonable installation, foundation and an alleged care charge, for all markers not sold by the cemetery where the marker is to be installed, said fee to include amounts substantially in excess of the actual cost of installation.
 
 
 8
 '(d) By the enactment and keeping in effect by Woodlawn, Rosewood, Greenlawn, Roosevelt and Princess Anne, unreasonable and illegal rules and regulations, which make it virtually impossible for a lot owner to purchase a bronze grave marker from dealers, such as plaintiff;
 
 
 9
 '(e) By refusing to permit the plaintiff, or any other retail monument dealer, to install grave markers and the foundation therefor in said cemeteries;
 
 
 10
 '(f) That the excessive and unreasonable charges made by Woodlawn, Rosewood, Greenlawn, Roosevelt and Princess Anne for installation, foundation and alleged care, out of which it exacts an enormous profit, make it virtually impossible for plaintiff to compete in the sale of said markers with said Woodlawn, Rosewood, Greenlawn, Roosevelt and Princess Anne, because plaintiff cannot and does not exact any such charges.'
 
 
 11
 Winnowing the defendants' uncontroverted assertions and plaintiff's concessa from the supporting and counter affidavits, interrogatories and depositions submitted with the motion, the trial judge found that the plaintiff failed to establish the combination or conspiracy, or the effectual or attempted monopolization, it laid to the defendants. His opinion threshes the record very thoroughly and demonstrates that the evidence does not disclose the presence of these indispensable elements even to the point of tendering a genuine issue thereon. Norfolk Monument Company, Inc. v. Woodlawn Memorial Gardens, Incorporated, et al., 290 F.Supp. 1 (E.D.Va. October 3, 1967). We accept this refinement of the proof.
 
 
 12
 There was simply no direct evidence proffered by the plaintiff of concert of action among the defendants. The only things the cemetery defendants had in common were that they engaged in the operation of cemeteries; each sold burial lots and maintained them; and each sold grave markers or plaques and installed them. No joint activity is disclosed-- not even conferences or meetings. The closest evidence to this point was that defendant Matthews' sales representatives frequently visited the cemeteries on business calls. This poverty of proof scarcely made an issue of any kind-- certainly none for a jury.
 
 
 13
 Moreover, the complaint's allegations of conduct and circumstances suggesting a combination and monopoly failed for want of any tender of proof of them. The District Judge found the accusations wholly without foundation. On these points he said in his opinion:
 
 
 14
 'Plaintiff's allegations that Matthews would sell only to cemeteries is negated by its own admission that it purchased from Matthews as late as 1965 and terminated such purchases only because it did not like the Matthews product and because Matthews was then a defendant in this suit.
 
 
 15
 'Plaintiff's allegation that the defendant cemeteries bought only from Matthews was founded apparently on an inspection by the plaintiff's President of these cemeteries which indicated the installation of many of Matthews markers. He admitted, however, that he saw others and had had his company's markers installed therein on occasion. It was further shown that one defendant cemetery had no Matthews markers at all, that some had as many as fifty percent (50%) of a different brand; and that a composite reading of all of the installations in all of the cemeteries showed at least thirty percent (30%) of a different manufacturer.'
 
 
 16
 Our canvass of the record verifies the dearth of proof in the particulars the District Judge just noted. A principal factor in the plaintiff's contention of his exclusion from competition with the defendants is the cemeteries' regulation prohibiting outsiders from installing markers. The reasonableness of this rule was not weakened by the plaintiff's evidence and is on its face apparent, as the opinion manifests:
 
 
 17
 'Plaintiff's allegation that it is not allowed to install markers in the defendant cemeteries is admitted by the defendants. Each reserves to itself the right to install all markers, regardless of from whom purchased. In view of the continuing obligation of perpetual care imposed upon the cemeteries, in its contracts with lot owners, in the light of the duty to preserve the cemetery property, all as provided in the cemetery sales agreements made plain to purchasers, such rules and regulations cannot be termed unreasonable. This applies as well to rules setting up specific alloy content as to bronze markers offered for installation and certification thereof.'
 
 
 18
 The chief feature urged as revealing conscious parallels of behavior by the defendant cemeteries-- and thus evincing joint and concerted action-- is the fee demanded for installing the makers. Of this item the trial court said:
 
 
 19
 'The allegation that there is a conspiracy to be uncovered in the fact that the charges are made by the cemeteries for installation of markers, whether such charges be conscionable or unconscionable is not only borne out but is denied in the plaintiff's own proffered exhibits of the different cemetery price scales. These show on their face a wide divergence of prices which would completely negative any systematic scheming or conscious parallelism. Plaintiff agreed that Matthews did not prescribe any charges.'
 
 
 20
 Moreover, the record points out that defendants' installation fees, in addition to being divergent, were arrived at by totally different pricing policies. One charged a flat fee regardless of marker size; while the others charged a fee computed on the square inches of marker surface area; and these fees differed significantly.
 
 
 21
 The exaction of the fee is accounted for by the memorial parks as embracing not alone the putting of the marker in place and keeping it clean, but also such items as the requisite constant watch over the condition of the markers, the repositioning of them when needed, and replacing them as necessary. The argument that the installation payment was designed solely to discourage plaintiff's sales by increasing the cost of its markers vanishes on consideration. Without it the cemeteries would be required to accept the plaintiff's markers without prospect of financial assistance in the attention to them in the future. No effort was made to show that the contributions to the Virginia statutory trust fund would suffice to provide the moneys necessary for this continued care. At all events, the standard of care may vary in different parks, and the requisite reserve is a matter of good business judgment-- surely not a jury issue.
 
 
 22
 The District Judge, too, altogether justified the utilization of summary judgment for decision although, granted, it should be 'sparingly practiced'. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); cf. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). No prejudice is shown by the plaintiff and a fair dispatch of the case was accomplished.
 
 
 23
 Affirmed.
 
 CRAVEN, Circuit Judge (dissenting):
 
 24
 Before it can be concluded that there has been a 'contract, combination or conspiracy' sufficient to invoke Section 1 of the Sherman Antitrust Act, it must be found that there was an 'agreement' (implied or express) between two or more persons or corporations. The issue presented by this appeal, 'only glancingly dealt with by courts,' is 'whether and when agreement can be found in 'consciously parallel' decisions by competitors' to adopt substantially identical exclusionary restrictions with respect to the sale and installation of grave markers.[1]
 
 
 25
 In Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), the Supreme Court affirmed that in order to make out a case for the jury it is not essential that the plaintiff establish a prior agreement. 'Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act (where each competitor knew that cooperation was essential to successful operation of the plan).' Id. at 227, 59 S.Ct. at 474.
 
 
 26
 Even so, the court affirms the granting of summary judgment despite the warning in Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), that 'summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.' As I read the record, it is simply full of examples of insufficiently explained parallel behavior from which a jury could reasonably find an 'agreement' to violate the Sherman Act. Moreover, the remarkable parallelism of conduct might reasonably be traced to sophisticated and subtle invitations extended by manufacturer Matthews to the trade. In evaluating 'motive and intent' I do not think it entirely without significance that manufacturer Matthews is not inexperienced in questions of antitrust,[2] about which I will have more to say later.
 
 
 27
 Defendants have urged upon us that the remarkably uniform practice of charging virtually prohibitive installation fees to permit the use of an outsider's grave marker and the other similar exclusionary rules and regulations are prompted and justified by legitimate business and economic reasons. I shall attempt to demonstrate that a jury might reasonably conclude to the contrary, but before doing so, I should note that if the evidence supports a finding of concerted action to limit or exclude plaintiff's trading opportunities, such group action is a per se violation of the Sherman Act and hence is not subject to the test of reasonableness.[3] Radiant Burners v. Peoples Gas, Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Fashion Originator's Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).
 
 
 28
 Since the question is whether or not the case should be submitted to a jury, it can only be answered by a somewhat detailed analysis of what the evidence might be but for the granting of motion for summary judgment. There follows such an appraisal:
 
 THE EXTENT OF PARALLELISM
 The record discloses:
 
 29
 (1) Despite the unskilled nature of the work,[4] all of the memorial parks refuse to permit the plaintiff to install markers sold by it; all of them insist that the work be done by the cemeteries themselves.
 
 
 30
 (2) None of the memorial parks charges lot owners a separate installation fee in the case of markers purchased from the cemeteries.[5]
 
 
 31
 (3) All of the memorial parks require the payment of an installation fee by the plaintiff for installing markers purchased from the plaintiff. The plaintiff plausibly maintains that the actual cost of installation comes to about $3. Yet, enormous installation fees are charged plaintiff, and there is remarkable similarity in the amounts charged:
 
 
 32
 Fees Charged Plaintiff for Installing 44 X 14 Double Bronze Memorial Plaques
 
 Rosewood $154.00
 Princess Anne $154.00
 Woodlawn $175.00
 Greenlawn $160.16
 
 33
 Roosevelt $123.20Fees Charged Plaintiff for Installing 24 X 14 Single Bronze Memorial plaques
 
 Rosewood $ 84.00
 Princess Anne $ 84.00
 Woodlawn $175.00
 Greenlawn $ 87.00
 Roosevelt $ 67.00
 
 34
 Roosevelt caters to a lower-income clientele. In the case of the other four memorial parks, the installation fees charged for 44 X 14 plaques fall within a range of $21. Woodlawn inexplicably charges the same fee for the installation of both sizes of markers. The fees charged by Rosewood, Princess Anne and Greenlawn for 24 X 14 markers fall within a range of $3. There is no evidence in the record explicative of such parallel behavior.
 
 
 35
 (4) All of the memorial parks require a specific alloy content in the bronze markers installed, and reserve the right to reject non-conforming markers. The alloy content requirement happens to be the same as manufacturer Matthews' markers and the same as is implicitly suggested in a pamphlet ('Modern Cemeteries') distributed by Matthews to its customers.[6] All of the memorial parks except Roosevelt are customers of Matthews.
 
 
 36
 (5) There is evidence that Greenlawn,[7] Woodlawn[8] and Princess Anne[9] have attempted to dissuade lot owners from purchasing markers from the plaintiff. The affidavit of plaintiff's president states that numerous other incidents of this nature have occurred.[10]
 
 
 37
 (6) Defendant Matthews, in its pamphlet 'Modern Cemeteries,' suggests a number of practices which in effect erect competitive barriers to retailers other than the cemeteries themselves.[11]
 
 
 38
 (7) Many of these practices have been adopted by the memorial park defendants, as evidenced by affidavits in the record,[12] and by the 'rule books' of Rosewood, Princess Anne and Greenlawn.[13]
 
 
 39
 (8) There is evidence of numerous visits to and conferences with the memorial parks by sales representatives of Matthews.[14]
 
 
 40
 I notice, also that this is at least the fourth time Matthews has been named co-defendant with memorial parks in antitrust actions attacking the same practices here under scrutiny. Each of the previous actions, Booth v. Jas. H. Matthews & Co., No. 60-418-Civ. (W.D.Pa.1963), Kaeppler v. Matthews, No. 25618-Civ. (E.D.Pa.1963), and United States v. Jas. H. Matthews & Co., No. 16818-Civ. (W.D.Pa.1958), was settled by a consent decree enjoining the specific practices here under attack.[15] While no issue of fact was litigated or admitted in these cases, it is not unreasonable to suppose that such litigation is of interest to the trade, and if reported to the trade, would tend to 'educate' defendants as to common methods of doing business. See Milgram v. Loew's, Inc., 192 F.2d 579, 584 (3rd Cir. 1951). The Matthews' pamphlet, 'Modern Cemeteries,' makes express reference to the antitrust troubles of the memorial park industry.[16]
 
 EFFECT OF PARALLELISM
 
 41
 The only record evidence of profit margin enjoyed by the memorial park defendants in marker sales appears in the answer to interrogatories of Woodlawn Gardens, Inc. The record shows the retail prices charged by all of the memorial parks, but wholesale cost is reflected only as to Woodlawn. Woodlawn's cost and sale price of 44 X 13 double bronze memorial plaques is as follows:
 
 
 42
 YEAR COST SALE
 PRICE
1960 $100.00 $300.00
1963 $117.00 $350.00
1966 $125.00 $375.00
 
 
 43
 Woodlawn's cost and sale price of 24 X 14 single bronze memorial plaques is as follows:
 
 
 44
 YEAR COST SALE
 PRICE
1960 $ 56.00 $168.00
1963 $ 59.00 $175.00
1966 $ 63.50 $190.00
 
 
 45
 Woodlawn's answer to interrogatories indicates that the above-quoted fees include 'all perpetual care, installation, and attendant service, together with guaranteed replacement, if necessary.' If it can reasonably be inferred, as, infra, I think it can, that these expenses are negligible and/or are funded by an independent source, it would appear that defendant Woodlawn markets its goods at a 200 percent markup over cost.
 
 
 46
 A discovery exhibit indicates that the plaintiff's supplier, Meierjohan-Wengler, Inc., charges $76 for a 24 X 14 marker and $172 for a 44 X 14 marker, thus making plaintiff's wholesale costs greater than Woodlawn's. The record contains direct evidence of plaintiff's retail prices: a random sample of (record) invoices dated 1963 through 1966 discloses that plaintiff has charged an average price of $175 for 24 X 14 single markers, and an average price of $338 for 44 X 14 double markers. The installation fee charged by the memorial parks is absorbed by the plaintiff and not passed on to the customer (except as contained in the price charged the customer for the marker). Inferring, as, infra, I think a jury reasonably could, that Woodlawn's overall costs (including perpetual care for the markers) are approximately the same as, or less than, plaintiff's, plaintiff is placed at an impossible competitive disadvantage by the enormous installation fee: in order to meet Woodlawn's price, plaintiff must suffer a loss on each sale of a 24 X 14 marker to a Woodlawn lot owner, e.g.,
 
 
 47
 Retail sale price: $190.00
Marker cost to
 Plaintiff $ 76.00
Installation fee $175.00
 $251.00
 LOSS $ 61.00
 
 
 48
 Moreover, it would appear that plaintiff can make only a gross profit of $38 on a sale of a 44 X 14 marker, e.g.,
 
 
 49
 Retail sale price: $375.00
Marker cost to
 Plaintiff $172.00
Installation fee $175.00
 $347.00
 PROFIT $ 28.00
 
 
 50
 This is to be contrasted with Woodlawn's apparent gross profit of slightly less than $250 per marker for 1966, and the marker is one inch smaller than that offered by plaintiff.
 
 
 51
 Woodlawn presents the most extreme case, among the memorial park defendants, of the impact of the installation-fee practice on plaintiff's trading opportunities. But on the same hypothesis the plaintiff's costs in sale of markers to be installed at all the defendant cemeteries is increased by the amount of the installation fee, from a high of $175 (Woodlawn) to a low of $67 (Roosevelt for 24 X 14 markers). Thus a jury could find that the installation-fee practice, together with other practices of the memorial parks, is calculated virtually to exclude plaintiff from the market.[17]
 
 DEFENDANT'S BUSINESS JUSTIFICATION
 
 52
 The memorial parks contend that the installation fees charged are justified by the expenses of perpetual care and maintenance. Unquestionably, I think, a jury could find otherwise. Of the answers to interrogatories, only Greenlawn's indicates the actual maintenance involved in caring for the markers.[18] Of the answers to interrogatories, only Roosevelt's[19] discloses the portion of the installation fee (paid by plaintiff) allocated to perpetual care of the markers, which it claims is $10. There is no record evidence of actual outlays for marker maintenance. On the other hand, a maintenance form published by Matthews[20] states that 'water' (rainwater?) is the best cleansing agent for the plaques. The discovery deposition of plaintiff's president, Charlie C. Gregory, contains the following testimony:
 
 
 53
 (Mr. Gregory) 'As far as perpetual care, if the cemetery deliberately goes out there and ruins the marker, then I would not be willing to replace it. But as far as lasting forever, it is of enduring metal. It will not deteriorate. It will not rust. What is perpetual care? No one gives a plaque perpetual care.
 
 
 54
 'Q Are they polished?
 
 
 55
 'A No, they are not polished.
 
 
 56
 'Q Are they grass trimmed?
 
 
 57
 'A That is maintenance of the cemetery. That is not for the plaque. That is your grass maintenance. The customer pays for that when he buys the lot.
 
 
 58
 'Q In other words, your testimony would be that there is no such thing as perpetual care of a bronze marker?
 
 
 59
 'A That is correct, yes, sir. All of the attention it ever needs is a little rain now and then to wash it off, or either a little water to wash it off.
 
 
 60
 'Q So according to your testimony there would not be any reason for making any provision for perpetual care?
 
 
 61
 'A That is correct, yes.'
 
 
 62
 If in fact substantial outlays are required for marker maintenance (it seems doubtful on this record), it is clear that apart from installation-fee revenue, ample funds exist to provide for maintenance of the plaques. Each of the memorial parks is required by Virginia statute to maintain an 'endowment trust fund,' for perpetual care purposes, of at least $25,000, 8 Code of Virginia 57-35.2 (1968 Cum.Supp.),[21] and to attribute ten percent of the purchase price of each lot to the trust, 8 Code of Virginia 57-35.3 (1968 Cum.Supp.).[22] The income from the trust can be devoted only to perpetual care purposes. 8 Code of Virginia 57-35.8 (1968 Cum.Supp.).[23]
 
 
 63
 Hence I see no reason why a jury could not reasonably reject defendant's story and find, on the contrary, that the defendant memorial parks insist upon an exorbitant installation fee in order to exclude plaintiff from competing with their own retail sales of markers. Such as inference seems to me strongly supported by evidence that (a) actual installation costs $3 plus unskilled labor of two men for perhaps an hour, (b) the best cleaning agent is plain water and (c) adequate funds for perpetual care are required by law to be derived from lot sale revenues and income from the $25,000 minimum care fund. To insist in the face of such a record that charging plaintiff an installation fee of as much as $175 per marker is so clearly related to expense incurred that no other inference may be drawn seems to me patently absurd. At the very least there is presented a material issue of fact.
 
 
 64
 Thus, there is at best only questionable business justification for those parallel practices which tend to the virtual exclusion of plaintiff from the market. Further, I think the record presents an issue of fact for trial over whether the formation of those parallel practices resulted from individual or concerted action.
 
 PROOF OF THE CONSPIRACY
 
 65
 Viewing the evidence most favorably to the plaintiff's case, Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), I think the answers to interrogatories, discovery exhibits and affidavits, together with the pleadings, present an issue of fact for jury trial as to the existence of a tacit agreement to limit and destroy the plaintiff's trading opportunities.
 
 
 66
 The evidence recited, supra, shows parallel behavior on the part of the memorial park defendants. That alone is not enough. Turner, The Definition of Agreement Under the Sherman Act; Conscious Parallelism and Refusals to Deal, supra, at 658. However, I think the record justifies the inference, and a jury could so find, that the defendants were mutually aware of the others' restrictive practices. Against the background of antitrust litigation over identical practices[24] (involving the defendant Matthews) such an inference seems clearly permissible. The Matthews pamphlet, 'Modern Cemeteries,' containing, supra, references to antitrust problems and suggestions to circumvent legal entanglement, could, I think, fairly be characterized as a 'joint invitation' to participate in the tacit agreement here alleged. Interstate Circuit, Inc. v. United States, supra. Moreover, as previously noted, the record does contain direct evidence of frequent conferences between the memorial parks and representatives of defendant Matthews, the alleged hub of the conspiracy.[25]
 
 
 67
 On facts closely analogous to those presented here, the Third Circuit has said,
 
 
 68
 'Our starting point in analyzing the evidence is the complete unanimity with which all the distributors refused to license features on first run to plaintiff and the substantial unanimity with which they gave the Boulevard (plaintiff's drive-in theater) a 28 day (delayed showing) status. * * * This uniformity in policy forms the basis of an inference of joint action.' Milgram v. Loew's, Inc., 192 F.2d 579, 583 (3rd Cir. 1951).
 
 
 69
 Thus, in Milgram, evidence of conspiracy was found in participation in, or in mere acquiescence in, parallel business practices, even without a showing of invitation and acceptance such as was present in Interstate Circuit, Id. 192 F.2d at 583-584.
 
 
 70
 In this case, the defendants' entitlement to summary judgment is rested on testimonial denials of the existence of an agreement, coupled with plaintiff's failure to come forward with direct evidence. 'But in this modern era of increasing subtleties, it is rare indeed for a conspiracy to ge proved by direct evidence. There is no dispute over the proposition that circumstantial evidence will sustain a finding of conspiracy.' Milgram v. Loew's, Inc., 192 F.2d 579, 583 (3rd Cir. 1951). While a party opposing a motion for summary judgment cannot rest on conclusory allegations, Robin Construction v. United States, 345 F.2d 610, 614 (3rd Cir. 1965), the burden is upon the movant to establish that no issue of fact remains for trial. Liberty Leasing Co., Inc. v. Hillsun Sales Corp., 380 F.2d 1013, 1014 (5th Cir. 1967). The defendants have, in my opinion, failed to come forward with an explanation for their parallel behavior which a reasonable juror could not disregard.
 
 
 71
 Where the plaintiff's case necessarily turns on inference, and where it is not 'quite clear what the truth is,' Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. at 467, 82 S.Ct. at 488, I would, in a conspiracy case, be disinclined to cut off the right to have a jury draw the proper inferences. Poller v. Columbia Broadcasting Systems, Inc., supra; Devex Corp. v. Houdaille Industries, Inc., 382 F.2d 17 (7th Cir. 1967); Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 365 F.2d 478, 485 (5th Cir. 1966); Wurzberg Bros., Inc. v. Head Ski Co., 276 F.Supp. 142 (D.N.J.1967). Evidence of conscious parallelism raises fact issues requiring the trial judge to submit the issue of conspiracy to the jury. Theater Enterprises v. Paramount Film Distrib. Corp., 346 U.S. 537, 542, 74 S.Ct. 257, 98 L.Ed. 273 (1954).
 
 
 72
 Finally, I think we should not overlook the fact that one of the major evils against which the antitrust acts were designed to guard is the exercise of 'the power arbitrarily to enhance prices * * *.' Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 52, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1910). It is partially through the 'private prosecution' of these antitrust suits that the congressional policy of protection of the public is implemented. I am not so naive as to suppose that mere admission of Norfolk Monument to competition will bring the high prices of grave markers tumbling down. But even a little competition may help-- and a little competition can invite more.
 
 
 73
 I would affirm the district court as to defendant Jas. H. Matthews & Co. of Virginia, which appears to be in the case by error. As to the parent Matthews company and the other defendants, I would reverse and remand for trial by jury.
 
 
 
 [1]
 The foregoing is a paraphrased application to this case of the introduction by Professor Turner to his authoritative article: Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655 (1962)
 
 
 [2]
 'Past proclivity * * * to unlawful conduct may be of some significance where the (alleged conspiracy is identical in scope and nature to a previous one).' Milgram v. Loew's, Inc., 192 F.2d 579, 584 (3rd Cir. 1951)
 
 
 [3]
 'There are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The stock exchange, tobacco warehouses and trade association cases are rightly viewed not as an exception to the rule but as distinguishable because the presumed purpose of group action (generally with some degree of state control) is not to eliminate or exclude competition but, instead, to improve public service. Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1962); Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Asheville Tobacco Board of Trade, Inc. v. Federal Trade Commission, 263 F.2d 502 (4 Cir. 1959). See Oppenheim, Federal Anti-Trust Laws 661 (2d ed. 1959). 4th Cir
 
 
 [4]
 It is said by one of the defendants that installation consists of pouring concrete in a prefabricated form, placing the marker in the wet concrete, removing the form after concrete hardens, digging a hole of proper size at the grave site to a depth of five or six inches and laying the marker and foundation in the excavation. Greenlawn's Answer to Interrogatories, Vol. 1, pp. 130, 131. The cost of the mortar is said to be about $3. Affidavit of Charles C. Gregory, Vol. 1, pp. 264-266
 
 
 [5]
 Plaintiff's interrogatory #7 states:
 'state the amount of installation charge by each of the defendant cemeteries paid by lot owners who purchased the markers directly from the cemeteries of both single and double markers for the years 1960 through 1965.' In response to this question, Roosevelt, Woodlawn, Rosewood and Princess Anne stated simply that the installation fee (charged to lot owners who purchase from the cemeteries) was included in the purchase price, without indicating the amount. Greenlawn made the conclusory statement that the fees were the same as charged to the plaintiff.
 
 
 [6]
 Matthews is under an injunction prohibiting it from making any suggestions to memorial parks as to the quality of markers installed in the parks. See note 19. However, on page 7 of 'Modern Cemeteries,' under the heading 'MEMORIALS,' Matthews states this fact and then immediately below recites the alloy content of its markers. See 'modern Cemeteries' at 7
 
 
 [7]
 Affidavit of Mrs. R. W. Garrett, Vol. 1, p. 287
 
 
 [8]
 Affidavit of James A. Beasley, Vol. 1, p. 288
 
 
 [9]
 Affidavit of Mr. and Mrs. G. C. Brehm, Vol. 1, p. 290
 
 
 [10]
 Affidavit of Charlie C. Gregory, Vol. 1, pp. 264, 267-270
 
 
 [11]
 'Our attorneys have indicated that any Cemetery would be well advised to notify all lot owners of the conditions in the Rules and Regulations relating to 'MEMORIALS' and the charges for installation and maintenance so that there cannot be allegations by lot owners, that they were not so notified.' 'Modern Cemeteries,' p. 11
 'MEMORIAL RULES AND REGULATIONS'
 
 
 [1]
 'Owing to changes made from time to time in the type of memorials permitted in various sections, it is suggested that Owners consult the Cemetery before orders are placed with memorial dealers, in order to comply with rules governing the type permitted in certain sections. Rules governing the erection of memorials are strictly adhered to.'
 
 
 [2]
 'All mausoleums, monuments, memorials, headstones or structures of any kind must be built according to the rules and regulations of the Cemetery.'
 
 
 [8]
 'Plans or sketches, with measurements, descriptions and specifications of all stonework or bronze to be placed in the Cemetery, must be submitted to the Management for examination and written approval before a foundation order for the work will be accepted; and in the case of monuments, memorials and mausoleums, detailed specifications must accompany the plans.'
 
 
 [11]
 'The Management reserves the exclusive right to reject all work which, on account of design, workmanship, material or faults of any kind, is in its opinion unsatisfactory.'
 
 
 [12]
 'All foundations of any kind shall be installed by the Cemetery, the charges for which shall be reasonable and payable in advance.'
 
 
 [25]
 'All monuments, markers and memorials which do not conform to the rules and regulations in sections in which they are placed will be removed.'
 
 
 [29]
 'Cleaning of memorials by outside firms is not permitted.'
 'Modern Cemeteries,' pp. 18C, 18D.
 
 
 [12]
 See, e.g., affidavit of Charlie C. Gregory, Vol. 1, pp. 264-273
 
 
 [13]
 Vol. 1, pp. 319, 332, 354
 
 
 [14]
 See answers to plaintiff's interrogatories #8 and #9
 
 
 [15]
 The decree in Booth v. Jas. H. Matthews & Co., No. 60-418-Civ. (W.D.Pa.1963), provided in its material respects:
 'V
 '(A) Each of the cemetery defendants is enjoined and restrained from:
 '(1) Requiring any person owning a lot or lots in any cemetery owned or controlled by it to purchase any marker from it.
 '(2) Refusing to install a marker that complies with the conditions described in this Final Judgment in any section of its cemetery wherein markers are permitted, and refusing to permit the installation of such markers where the cemetery defendant itself declines to make the installation.
 '(3) Discriminating between lotowners purchasing markers from it and lotowners purchasing markers from other persons in any or all the following respects:
 '(a) the amount of charges for installation or maintenance of a marker,
 '(b) the services included in the charges for installation and maintenance of a marker;
 '(c) the period of time following delivery of the marker to the cemetery within which it shall be installed.
 '(4) Informing its lotowners that markers cannot be purchased for installation in its cemetery from any person other than it.'
 Named as co-defendants with Matthews in this action were 19 Pennsylvania memorial parks: Forest Lawn Gardens, Inc., Sunset View Memorial Park, Penn-Lincoln Memorial Park, Inc., Rose Lawn Memorial Gardens, Inc., Sunset Hill Memorial Park, William Penn Memorial Park, Restland Memorial Park, Monongahela Valley Memorial Park, Sylvannia Hills Memorial Park, Inc., Allegheny County Memorial Park, Greene County Memorial Cemetery Company, Lafayette Memorial Park Cemetery, Greenwood Memorial Park, Inc., Westmoreland County Memorial Park, Inc., Somerset County Memorial Park, Lakewood Memorial Gardens, Inc., Hollywood Memorial Park, Inc., McKean Memorial Park.
 An identical decree was entered against 15 Pennsylvania memorial parks (in both actions Matthews was dismissed as a party-defendant) in Kaeppler v. Matthews, No. 25618-Civ. (E.D.Pa.1963). Enjoined from the practices recited above were the following: George Washington Memorial Park, Inc., Edgewood Memorial Park Company, Glenwood Memorial Gardens, Inc., Philadelphia Memorial Park, Inc., Rolling Green Memorial Park, Inc., Sunset Memorial Park Company, Valley Forge Gardens, Inc., Wastminister Gardens Cemetery Company, White Chapel Gardens, Inc., Whitemarsh Memorial Park Cemeteries Company, Inc., Northhampton Memorial Shrine, Inc., Ceder Hill Memorial Park, Inc., Arlington Mrmorial Park, Forest Hills Memorial Park, Inc., Schuylkill Memorial Park, Inc., Sky-View Memorial Park, Inc.
 In United States v. Jas. H. Matthews & Co., No. 16818-Civ. (W.D.Pa.1958), Matthews was enjoined from the following practices:
 'V'
 '(D) Making any suggestion or recommendation for any cemetery the purpose or effect of which is, or may be to eliminate or restrict sales, by any person, of bronze markers for installation in such cemetery.
 'VI
 '(A) The defendant is enjoined and restrained from, directly or indirectly, selling markers to any cemetery with knowledge that such cemetery:
 '(1) reserves to itself the exclusive right to sell markers for installation within its confines; or
 '(2) refuses to install bronze markers reasonably appropriate for installation in said cemetery, which are sold by other retail marker dealers;
 '(3) has any rule, regulation, or follows any regularly established course of conduct which makes it unreasonably difficult or more costly to have installed within its confines bronze markers sold by persons other than such cemetery.
 'VII
 The defendant is ordered and directed not later than ten (10) days after the effective date of this Final Judgment:
 '(A) To mail a copy of this Final Judgment to each person engaged in selling markers or monuments at retail, who, since January 1, 1954 has purchased, or who, to the knowledge of the defendant, has sought to purchase, markers from the defendant * * *.'
 The record does not indicate whether the defendants in this action received copies of the above-quoted consent decree.
 
 
 [16]
 See 'Modern Cemeteries,' pp. 1, 17
 
 
 [17]
 Plaintiff's president testified that Norfolk Monument has suffered extensive loss of marker sales because of the exclusionary practices here under attack. See discovery deposition of Charlie C. Gregory, Vol. III, pp. 59, 77-80
 
 
 [18]
 See Vol. 1, pp. 130, 131. Greenlawn indicates that perpetual care for the markers involves only the following:
 '1. Cleaning memorial periodically, usually every two to three weeks.
 '2. Trimming around memorial by hand during the growing season every 10 to 15 days. The type of grasses used are of the fast growing variety (Bermuda or Wild grass) specifically of which would grow completely across a marker in this period of time.' Id. at 131.
 
 
 [19]
 Vol. 1, pp. 124, 125
 
 
 [20]
 See Vol. 1, pp. 278, 279
 
 
 [21]
 'After June twenty-sixth, nineteen hundred and sixty-four, it shall be unlawful for any person, firm, association or corporation, hereinafter referred to as 'person,' owning, operating or developing any cemetery to sell or offer for sale in this State, either as principal or otherwise, any lot, parcel of land, burial or entombment right in such cemetery, and in connection therewith to represent to the public in any manner, express or implied, that the entire cemetery, a single lot therein, or burial or entombment right therein will be perpetually cared for, unless adequate provision has been made for the endowment care of the cemetery and all lots, burial or entombment rights therein as to which such representation has been made. Each person who shall undertake to develop any such cemetery after June twenty-sixth, nineteen hundred and sixty-four, shall deposit in a bank in this State in an irrevocable endowment trust fund a minimum of twenty-five thousand dollars before the first lot, parcel of land, burial or entombment right has been sold.'
 
 
 [22]
 'Each person owning, operating or developing any such cemetery before or after June twenty-sixth, nineteen hundred and sixty-four shall hereafter deposit in a bank in this State, or in another state, if such person has, prior to June twenty-sixth, nineteen hundred and sixty-four, entered into a trust agreement by which he is required to make at least the minimum deposit required hereunder, a minimum of ten per centum of the selling price of each lot, interment right, and above ground crypts and niches, excluding below ground burial vaults, sold, which amount shall be paid in cash and deposited with the trustee of the care fund not later than thirty days after the close of the month in which payments on the sale are completed.'
 
 
 [23]
 'The income from the endowment care fund shall be used solely and exclusively for the general care, maintenance, administration and embellishment of the cemetery and shall be applied in such manner as the person owning, operating or developing such cemetery may from time to time determine to be for the best interest thereof.'
 
 
 [24]
 See note 15
 
 
 [25]
 See note 14 and accompanying text