**Paul KAISER t/a Wamsley Pontiac**

v.

**GENERAL MOTORS CORPORATION (PONTIAC MOTOR DIVISION).**

Civ. A. No. 71–1242.

United States District Court, E. D. Pennsylvania.

May 20, 1975.

**34**

Robert H. Malis, Philadelphia, Pa., for plaintiff.

W. Bradley Ward, Philadelphia, Pa., for defendant.

### OPINION

DITTER, District Judge.

In this case, cross-motions for summary judgment require me to determine whether an automobile manufacturer's refusal to permit one of its dealers to relocate his place of business creates a valid claim for relief.

### I. FACTUAL BACKGROUND

Plaintiff, Paul Kaiser, is the sole proprietor, chief executive, and general manager of Wamsley Pontiac in Morrisville, Bucks County, Pennsylvania. Defendant, Pontiac Motor Division of General Motors Corporation, manufactures and distributes automobiles and spare parts.

To market its products, Pontiac has established a system of franchising dealerships that are locally owned and operated by private businessmen. Under this plan, each Pontiac dealer is granted the non-exclusive right to purchase new Pontiacs at dealer prices and to resell them in a manner which promotes maximum sales and preserves the reputation and goodwill of Pontiac.

Defendant views its dealers not only as salesmen for new automobiles, but as the components of a comprehensive and integrated network of repair and service facilities, each segment of which promotes car sales on a nationwide basis. A continuing effort is made to match dealers with areas where sales and services are needed. Demographic and economic studies are used as a basis for providing the right number of dealers in the right places to attract sales and guarantee convenient accessibility of service franchises and parts supplies to the largest possible segment of the public.

On March 14, 1962, the parties entered into a five-year dealer selling agreement which imposed upon plaintiff "the obligation to develop properly the sale [of Pontiac automobiles] at retail particularly in the following area: In the State of Pennsylvania: In Bucks County—Morrisville, Fairless Hills, Yardley." In addition, the agreement stated:

In order to provide product representation commensurate with the good will attached to the name "Pontiac" and to facilitate the proper sale and servicing of Pontiac Motor vehicles, parts and accessories, Dealer will maintain a place of business satisfactory as to appearance and location, and adequate in size and layout for new motor vehicle sales operations, service operations, parts and accessories sales and used car sales, and will maintain the business hours customary in the trade.

Once Dealer is established in facilities and at a location mutually satisfactory to Dealer and Pontiac, *Dealer will not move to or establish a new or different location, branch sales office, branch service station, or place of business including any used car lot or location without the prior written approval of Pontiac* [emphasis added].

From Pontiac's standpoint, control over where its dealers locate is a means to avoid ruinous competition among them and to preserve the effectiveness of its nation-wide service system.

In February of 1963, defendant redefined and assigned to plaintiff what it termed its Trenton, New Jersey Metropolitan Area [1] to include additional contiguous areas, including the city of Morrisville, Pennsylvania. Plaintiff by letter expressly consented to this expansion, and the parties subsequently executed a supplement to the dealer selling agreement redefining and enlarging the plaintiff's area of sales and service responsibility.

A new expressway, connecting Trenton, New Jersey with U. S. Route 1 in Pennsylvania at a point near Langhorne, Pennsylvania, was opened in 1965. The effect of this new highway was to reroute some traffic which previously had passed through Morrisville. Plaintiff contends that the change in traffic pattern resulted in a decrease in his volume of business. Nevertheless, the March, 1962, dealer selling agreement was superseded by a new one dated November 1, 1965, for a term expiring October 31, 1970. This agreement assigned to plaintiff the same primary area of responsibility and contained a provision that, absent a mutual modification of the contract, he would continue to operate at his Morrisville location.

In the summer of 1966 plaintiff first discussed with James Buckland, then district manager for Pontiac, the possibility of relocating his dealership. Plaintiff and Buckland thereafter looked for suitable sites within the Pennsylvania portion of the Trenton Metropolitan Area. Plaintiff subsequently proposed to Pontiac that he relocate his dealership at a point near the Reedman automobile sales complex on Route 1 in Langhorne. Pontiac rejected this suggestion because (1) the contemplated site was outside the Trenton Metropolitan Area; (2) Pontiac regarded the borough of Morrisville as a point to be serviced by plaintiff; and (3) of the potential impact of the change on other Pontiac dealers in the general area.

Throughout 1967 and 1968, plaintiff continued to express an interest in moving his dealership to the Langhorne area. He was repeatedly refused permission to do so because (1) that location was within the area of responsibility of Reedman Pontiac, a dealership operated by Joseph ("Ted") Reedman in Bristol; (2) the unique circumstances of the Reedman Chevrolet complex [2] had resulted in a "false and inflated market"; and (3) because Pontiac believed two dealers were needed in the Trenton Metropolitan Area.

Plaintiff subsequently sought another site for relocation, and in the fall of 1968, proposed to move to Lincoln Point, Falls Township, Pennsylvania. Pontiac Division's Organization and Analysis departments approved this proposal, and plaintiff pursued negotiations to obtain an option on the Lincoln Point location. Although the validity of the "option" plaintiff obtained in August of 1969 is questionable, it is plain that he failed to preserve or extend whatever rights he

1. "The Marketing Staff of General Motors Corporation, in conjunction with each automotive division of the Corporation, establishes Metropolitan Areas as a part of the orderly marketing of its products. Generally, each city having a population of 50,000 or more, according to the latest U.S. Census, will be designated as a Metropolitan Area." Defendant's Brief at 4, citing G.M.C. Answer to Plaintiff's Interrogatory No. 1(c) and (d).

2. See note 11, infra.

did possess with respect to the site.[3] By the time Pontiac had fully approved the proposed relocation and the Trenton Metropolitan Area had been redefined by General Motors to encompass the Lincoln Point property, plaintiff notified Pontiac that he had lost his "option", and again requested permission to relocate in Langhorne. Pontiac refused for the same reasons it had proffered previously.

In November, 1970, the parties entered into a new dealer sales and service agreement for a five year period ending October 31, 1975, and this contract is still in effect. Plaintiff continued to seek Pontiac's consent to relocate in Langhorne and Pontiac steadfastly refused to permit him to do so.

Plaintiff commenced the present action in May, 1971, invoking the jurisdiction of this court pursuant to Section 4 of the Sherman Anti-Trust Act, 15 U.S.C. § 12,[4] the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225, and the parties' diversity of citizenship as authorized by 28 U.S.C. § 1332.

## II. THE PLEADINGS AND CONTENTIONS OF THE PARTIES

Fairly read, plaintiff's complaint alleges three causes of action. First, he submits that Pontiac conspired to protect the competitive position of Reedman Pontiac by refusing to permit him to relocate his place of business nearer to that of Reedman. Next, plaintiff asserts that Pontiac restricted the area in which he was allowed to conduct his business and "unreasonably and without due cause, and in violation of the terms, covenants and conditions of plaintiff's dealership franchise agreement, prevented the plaintiff from moving his business to a location or place within the territory previously assigned . . ." Finally, he contends that Pontiac unilaterally withdrew a substantial portion of his sales territory and refused to permit him to relocate his dealership either within or without his "primary area of responsibility," both of which actions he alleges constituted a breach of the dealer selling agreement.

Defendant for its part denies any wrong or damage to the plaintiff by virtue of any of its actions or conduct, denies any breach of its agreement with plaintiff, and asserts that the dealer selling agreements between plaintiff and itself were valid in all respects. Defendant further avers that there is no genuine issue as to any material fact and that it is entitled to summary judgment as a matter of law.

In response to defendant's motion, plaintiff has proffered two arguments. Initially, he asserts that summary judgment is inappropriate on three grounds. First, he submits that genuine and material issues of fact exist with respect to the alleged conspiracy in violation of the Sherman Act, the proof of which is within defendant's sole control.

---

3. Plaintiff paid no consideration for the "option," and the only writing relating to it is a letter from Paul Kash and Frank J. Ray to plaintiff, dated August 19, 1969, which reads as follows:

> Regarding our recent conversation about the tract of ground at West Trenton Avenue and Route #1, we shall hold open your first right of refusal for sixty (60) days. If we obtain a buyer before you go to agreement with us, then you will be notified and have the first opportunity to firm out an agreement.

Plaintiff never furnished or exhibited a copy of the "option" to anyone at Pontiac.

In his deposition plaintiff acknowledged that he made no attempt to exercise the "option" or to renew it within sixty days after August 19, 1969, as contemplated in the letter from Messrs. Kash and Ray. During that sixty-day period Mr. Kash advised plaintiff that he (Kash) was negotiating with other prospects and that if he obtained a purchaser, any obligation to plaintiff would have to cease. Nonetheless, plaintiff did nothing to preserve his rights.

4. This is a singularly curious and inappropriate section upon which to assert jurisdiction. Section 12 of Title 15 simply defines various terms and establishes no substantive offense in and of itself.

Next, plaintiff contends that factual issues exist with respect to the defendant's motive and intent, which are of crucial significance where the Automobile Dealers' Day in Court Act has been invoked. Third, he argues that he has established a prima facie case of fraud. Alternatively, plaintiff contends that in the absence of any material issue of fact, he is entitled as a matter of law to summary judgment.[5]

## III. SUMMARY JUDGMENT IN ANTITRUST SUITS

■ That summary judgment is rarely appropriate in complex antitrust litigation is not surprising. See *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed. 2d 458 (1962);[6] *In re Penn Central Securities Litigation,* 367 F.Supp. 1158, 1167 (E.D.Pa.1973). Nevertheless, summary judgment, if otherwise justified, is clearly proper in antitrust cases. See *International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947); *Goldinger v. Boron Oil Co.,* 375 F.Supp. 400, 413 (W.D.Pa. 1974). Moreover, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.

Ed.2d 569 (1968);[7] *Drake Motor Lines, Inc. v. Highway Truck Drivers and Helpers Local No. 107,* 343 F.Supp. 1130 (E.D.Pa.1972). Rather, he must produce some evidence to establish the existence of the facts which will support his allegations.

[3] Plaintiff's assertion that Pontiac is in sole control of all proof of the alleged conspiracy does not change the rule.[8] In *First National Bank of Arizona v. Cities Service Co.,* supra, the plaintiff alleged a conspiracy among seven major oil companies, in violation of the Sherman Act, to prevent plaintiff's selling Iranian oil. The district court held that evidence of the defendant's failure to reach accord with the plaintiff with respect to the sale of the Iranian oil was insufficient, in light of other evidence, to raise a genuine triable issue of fact as to whether the defendant had participated in the alleged conspiracy with other companies to boycott the plaintiff. Both the Court of Appeals and the Supreme Court affirmed. In rejecting the plaintiff's claim that the defendant had not disproved its participation in the alleged conspiracy, despite the fact that the only suggestion of such participation was the plaintiff's allegation thereof, the Supreme Court said:

> Essentially all that the lower courts held in this case was that Rule 56(e) placed upon [plaintiff] the burden of

5. As a result of plaintiff's alternative responses to the defendant's motion for summary judgment, defendant would have this court impute to plaintiff "a clear admission that the case presents no factual dispute requiring trial." Such a conclusion would be patently erroneous. See Rule 8(e)(2), Fed. R.Civ.P.; *Sanisidro v. Dampskisselskabet Torm, A/S,* 45 F.R.D. 29 (E.D.Pa.1968).

6. As the Supreme Court stated in *Poller*:
 . . . summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot [footnote omitted]. 368 U.S. at 473, 82 S.Ct. at 486.

7. The Supreme Court pointed out in *Cities Service* that the explicit purpose of amend-

ing Rule 56(e) of the Federal Rules of Civil Procedure was to overturn a line of Third Circuit cases holding that a party could, by relying on his well pleaded allegations, successfully oppose a motion for summary judgment. 391 U.S. at 289 n. 19, 88 S.Ct. at 1593 n. 19.

8. Compare *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 490, 7 L.Ed.2d 458 (1962) with *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

Indeed, to hold that plaintiff must be deemed to present a sufficiently controverted issue of conspiracy because he has no access to proof of a conspiracy would be a ludicrous exercise of judicial legerdemain.

producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, *we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.* [emphasis added]

391 U.S. at 289–90, 88 S.Ct. at 1593. See, e. g., *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 643 (9th Cir. 1969); *Oak Distributing Co. v. Miller Brewing Company*, 370 F.Supp. 889, 896–97 (E.D.Mich.1973).

## IV. SUMMARY JUDGMENT IN THE CASE AT BAR

The propriety of summary judgment in the instant suit depends, of course, upon the merits of plaintiff's allegations under his three asserted legal grounds for recovery, i. e., the Sherman Act, the Automobile Dealers' Day in Court Act, and common law fraud.

### A. ANTITRUST CLAIM

#### 1. Conspiracy contention.

 To establish a violation of Section 1 of the Sherman Act, the existence of a contract, combination, or conspiracy between two or more parties must be demonstrated. See, e. g., *GAF Corp. v. Circle Floor Co.*, 329 F.Supp. 823, 827 (S.D.N.Y.1971), aff'd, 463 F.2d 752 (2d Cir. 1972); *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478, 484 (5th Cir. 1966). Paragraph 16 of the complaint alleges in essence that Pontiac and Ted Reedman of Reedman Pontiac entered into a conspiracy to prevent plaintiff's relocating his dealership close to Reedman's. Yet despite voluminous discovery, plaintiff has failed to produce any evidence of such an agreement.[9] Quite to the contrary, the unrebutted affidavits before the court demonstrate that Pontiac's refusal to permit plaintiff to relocate in Langhorne was motivated exclusively by business considerations.[10] Plaintiff's unsubstantiated hope that he can at trial produce evidence of a conspiracy[11] is in-

9. Plaintiff's counsel conceded at oral argument that he had failed to depose Ted Reedman. Tr. 55–56. In light of plaintiff's bold assertions of a conspiracy, this omission is, to say the least, startling.

The only reference to any communication between Pontiac and Ted Reedman concerning plaintiff's proposal was made in the affidavit of Warren Brooks, docket entry number 29 in this proceeding. Mr. Brooks, the Pontiac district manager of district 2, comprised of southern New Jersey dealerships and several in Pennsylvania, stated that in 1968 he informed Mr. Reedman that if Pontiac, in the exercise of its independent business judgment, looked favorably upon plaintiff's proposed relocation in Langhorne, then Pontiac would want Reedman's approval in

writing. Such approval would be needed, Mr. Brooks explained, because plaintiff would be moving into Reedman's contractually-defined area of responsibility. Inasmuch as Pontiac itself never authorized plaintiff's move to Langhorne, Mr. Reedman's approval never was either needed or secured. Plaintiff admits that he has no evidence of any other communications with Pontiac and Reedman regarding plaintiff's proposal and none appears in any of the documents before this court.

10. See text, page 35.

11. Ted Reedman's nephew is the owner of Reedman Chevrolet Inc., located on Route 1 in Langhorne, Pennsylvania. Reedman

sufficient to constitute a genuine issue of material fact required to defeat a motion for summary judgment.[12]

2. Franchise Agreement Aspects.

The franchise agreement on its face is not violative of the antitrust laws. The permissible limits of franchisor control of franchisees were discussed in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S. Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967), wherein the Court stated:

> . . . a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods. Cf. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L. Ed. 992 (1919). If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the

merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act.

In *Boro Hall Corp. v. General Motors Corp.*, 124 F.2d 822, reh. denied, 130 F. 2d 196 (2d Cir. 1942), *cert. denied*, 317 U.S. 695, 63 S.Ct. 436, 87 L.Ed. 556 (1943), Judge Augustus Hand held that the restriction of sales of automobiles by a manufacturer and distributor to a dealer who would confine its headquarters for dealings to some extent, so as not unduly to affect other authorized dealers, was reasonable and not violative of the Sherman Act. Conversely, in *Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637 (10th Cir.), cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973), an exclusive dealing contract which merely assigned a territory within which the distributor was authorized to sell, but did not mention, much less

---

Chevrolet is a gargantuan operation involving by its advertisements "hundreds of cars and trucks traded weekly." In a remarkable colloquy between the court and plaintiff's counsel at oral argument, counsel disclosed his unsubstantiated, and by his own admission possibly never provable, suspicion concerning Pontiac's motive in refusing plaintiff's request to relocate in Langhorne:

The Court: That brings me to the other question I really wanted to ask you.

What reason does Pontiac have in wanting to protect Reedman?

Why protect Reedman anymore than protect Wamsley?

Mr. Malis: Because of another Mr. Reedman, it is our belief, and there is nothing in the record on this point yet. Certainly, there may never be. It is our belief that the true motive in wanting to protect Reedman Pontiac is by reason of a tremendous influence exerted by Reedman Chevrolet, which is his nephew, the largest Chevrolet dealer, I think, in the country who is located in Langhorne and so he has, and everyone knows he has tremendous, tremendous influence. He is in fact selling Pontiacs, brand new ones. We have determined that simply by looking at his advertising.

And so, the motive lies in the relationship between Reedman Pontiac in Bristol and the desire on the part of the largest

Chevy dealer in the country to lend some of that power or influence to prevent anyone from coming in to compete with Reedman's Pontiac.
Tr. 59–60

12. Inasmuch as I have concluded that no material issue of fact exists with respect to plaintiff's allegation of a conspiracy it is unnecessary for me to consider defendant's alternative argument, i.e., that an agreement between Pontiac and Ted Reedman to deny plaintiff's proposed relocation still would not be violative of the antitrust laws. I do note with some interest in this regard, however, a line of cases in this Circuit which seem to stand for the proposition that a manufacturer is free to choose which dealers shall distribute its products even should such a choice involve an agreement or combination with one dealer against another. See *Ark Dental Supply Co. v. Cavitron Corp.*, 323 F. Supp. 1145 (E.D.Pa.1971), aff'd, 461 F.2d 1093 (3d Cir. 1972); *Marsin Medical Supply Co., Inc. v. Howmedica, Inc.*, Civil No. 74–160 (E.D.Pa., filed March 21, 1974); *Eastcoast Equipment Co. v. Harnischfeger Corp.*, 1973 CCH Trade Cases ¶ 74,560 (E.D.Pa.1973); *Peerless Dental Supply Co. v. Weber Dental Manufacturing Co.*, 283 F.Supp. 288 (E.D.Pa. 1968).

forbid, sales outside the territory, was held lawful.

The Supreme Court specifically declined, almost a decade ago, to consider the legality of the General Motors location clause. See *United States v. General Motors Corp.*, 384 U.S. 127, 139–40, 86 S.Ct. 1321, 1327–28, 16 L.Ed.2d 415 (1966). In concurring, however, the late Mr. Justice Harlan stated, "In my opinion, . . . General Motors is not precluded from enforcing the location clause by unilateral action, and I find nothing in the Court's opinion to the contrary." *Id.* at 149, 86 S.Ct. at 1332. And the lower federal courts have uniformly sustained the reasonableness and legality of the franchise location clause in actions brought under the Automobile Dealers' Day in Court Act, supra. See, e. g., *Woodard v. General Motors Corp.*, 298 F.2d 121 (5th Cir. 1962); *Salco Corp. v. General Motors Corp.*, 1973–2 C.C.H. Trade Cases ¶ 74,745 (D.Colo. 1973).

Furthermore, plaintiff's claim that defendant established horizontal allocation of selling areas is without factual or legal support. The testimony here, including that of the plaintiff, demonstrates without contradiction that the designation of an area of sales responsibility in a dealer selling agreement does not operate in any way to restrict the territory within which the dealer may make sales. Rather, the clause merely insures adequate facilities to provide for the sales and servicing of Pontiac automobiles to the motoring public within the dealer's primary area of responsibility. The right of a franchisor to designate geographical areas wherein its dealers shall be primarily responsible for the distribution of its products was recognized by the district court on remand in *United States v. Arnold, Schwinn & Co.*, 291 F.Supp. 564 (N.D.Ill.1968). In its final decree, the court stated:

Notwithstanding the foregoing provisions, nothing in this Final Judgment shall prevent Schwinn from *maintaining and creating* or eliminating *areas or territories of prime responsibility for its distributors; from choosing and selecting its distributors and retailers or designating geographic areas in which such distributors shall respectively be primarily responsible* for distributing Schwinn products, or from terminating such distributorships of distributors who do not adequately represent Schwinn and promote the sale of Schwinn products in areas so designated as their primary responsibility; *from designating in its retailer franchise agreements the location of the place or places of business for which the franchise is issued;* or from engaging in any activity rendered lawful by subsequent legislation enacted by the Congress of the United States [emphasis supplied].

*Id.* at 565–66. And in analyzing a selling agreement identical to those in the case at bar, the Supreme Court concluded that it " . . . does not restrict or define those to whom the dealer may sell. Nor are there limitations as to the territory within which the dealer may sell." *United States v. General Motors Corp.*, supra, 384 U.S. at 130, 86 S.Ct. at 1322.

Plaintiff's reliance upon *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 365 F.Supp. 1073 (D.N.J.1973), is misplaced. There, plaintiff American Motor Inns, Inc. (AMI), a franchisee of Holiday Inns, Inc. (HI), alleged a violation of Section 1 of the Sherman Act on the theory that HI conspired with others to restrain and monopolize trade in the Newark, New Jersey, area hotel-motel industry. HI's standard practice, upon receipt of an application to construct a new Holiday Inn, was to send out "radius letters," i. e., written notices of the application to at least the three Holiday Inns nearest the proposed site, affording them fifteen days to comment upon the proposed additional inn. Although HI's executive committee made the final determination where there was an objection to an application, the court held that the

radius letter gave to existing franchisees a "veto of sorts" over applications for franchises and constituted a conspiracy to allocate territories horizontally in violation of the Sherman Act.

In contrast, as previously stated, the dealer selling agreement in the case at bar imposes no restraint upon competition with respect to the sale of Pontiac automobiles: each dealer is entirely free to sell to customers in every other dealer's primary area of responsibility. Furthermore, the provisions of the franchise agreement in *American Motor Inns* operated effectively to provide for the allocation of exclusive sales territories, free of competition from other franchisers, while the record evidences no such restraint in the present case. Finally, the type of affirmative and vigorous opposition of existing HI franchisees to AMI's application in *American Motor Inns* is conspicuously absent in the case at bar.[13]

### 3. Group Boycott Claim

■ Plaintiff's final argument—that GMC's requirement of approval by the sales section of the marketing staff of an application for relocation of an existing dealership constitutes a *per se* violation of the Sherman Act in the form of a group boycott—also must be rejected as lacking either a factual or legal foundation.[14] In asserting this proposition plaintiff relies upon two United States Supreme Court cases, *United States v. General Motors Corp.*, supra, and *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Neither is helpful to him. *Klor's* involved an alleged conspiracy between a retailer and ten manufacturers and their distributors either not to sell to plaintiff or to sell to it only at discriminatory prices and highly unfavorable terms. In reversing a grant of summary judgment to the defendants, the Court defined group boycotts as "concerted refusals by traders to deal with other traders," which refusals "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment [footnote omitted]." Id. at 212, 79 S.Ct. at 709. The crucial contrast between the facts in *Klor's* and those in the instant case, however, is emphasized in the following language in Mr. Justice Black's opinion for the Court:

> This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive dealership. Alleged in this complaint is a wide combination consisting of manufacturers, distributors and retailers. This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale, and in some instances forbids them from selling to it on any terms whatsoever.

Id. at 212–13; 79 S.Ct. at 709–10. Because General Motors and Pontiac are a single corporate entity, there can be no "group," and *Klor's* is inapplicable to the case at bar.

In *United States v. General Motors Corp.*, supra, the Court held that joint collaborative efforts by Chevrolet dealers, Chevrolet dealer associations, and General Motors Corporation to eliminate a class of competitors by terminating dealings with them and a minority of Chevrolet dealers, and to deprive fran-

---

13. Plaintiff in *American Motor Inns* also contended that it was illegal under Section 1 of the Sherman Act for HI to deny an application for a Holiday Inn franchise in a "parent company town," in which HI operated its own inn because of its anit-competitive effect. Judge Garth rejected this argument, holding that "HI may grant or reject franchise applications at will when it operates as a franchisor, . . ." *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 365 F.Supp. 1073, 1092 (1973).

14. A similar contention also was rejected in *American Motor Inns, Inc.*, supra at 1090–91.

chised dealers, if they so chose, of their freedom to deal through discounters, constituted an unlawful conspiracy in violation of the Sherman Act. The unilateral exercise by General Motors of its right to disapprove a request by an existing franchisee to relocate his dealership, without the collaboration with others in the decision making process, can by no stretch of the imagination be said to constitute a "group boycott" within the meaning of *United States v. General Motors Corp.* and *Klor's.* Plaintiff has offered no evidence whatever of any refusal, concerted or otherwise, by anyone to deal with him, or to deny him access to Pontiac automobiles, or to interfere with his contractual right to sell Pontiacs to anyone anywhere.

█ I, therefore, conclude that Pontiac's refusal to allow plaintiff to relocate his dealership in Langhorne constituted no antitrust violation.

## B. DEALERS' ACT CLAIM

█ Plaintiff's claim under the Automobile Dealers' Day in Court Act, also known as the Automobile Dealers' Franchise Act, 15 U.S.C. §§ 1221–1225, is equally ineffective to bar summary judgment. That statute created a new cause of action in favor of a franchised automobile dealer against an automobile

manufacturer for damages sustained "by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise."

A long line of cases in this Circuit have strictly construed a lack of good faith, as used in the context of this statute, to require a showing of coercion or intimidation. See *Milos v. Ford Motor Co.*, 317 F.2d 712, 715–16 (3d Cir.), cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L. Ed.2d 125 (1963); *Globe Motors, Inc. v. Studebaker-Packard Corp.*, 328 F.2d 645, 646–47 (3d Cir. 1964); *Garvin v. American Motors Sales Corp.*, 318 F.2d 518, 520 (3d Cir. 1963); *Berry Brothers Buick, Inc. v. General Motors Corp.*, 257 F.Supp. 542, 546 (E.D.Pa.1966), aff'd per curiam, 377 F.2d 552 (3d Cir. 1967).[15] Having failed to allege that defendant's conduct even begins to approximate coercion or intimidation, plaintiff cannot maintain a claim under this statute.[16]

## C. COMMON LAW FRAUD

Plaintiff lastly submits that he has established a prima facie case of fraud, precluding summary judgment for the defendant. Plaintiff's theory of fraud centers around the "plus" territory[17]

15. The legislative history of the Act fully supports this interpretation. See *Milos v. Ford Motor Company*, 317 F.2d 712, 715–16 (3d Cir.), cert. denied 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963).

16. Plaintiff contends that in *Rea v. Ford Motor Co.*, 497 F.2d 577 (3d Cir. 1974), the most recent case in which the Court of Appeals has had occasion to construe the Act, it rendered a more flexible interpretation. Upon a close reading of the case, I disagree. Although the court in *Rea* did hold that whether an automobile manufacturer has acted with sufficient justification to constitute good faith is a factual question to be determined upon the circumstances of each particular case, id. at 585, there is not even the slightest hint that the fundamental definition of a lack of good faith, i. e., intimidation or coercion, has been diluted. Quite the contrary intention is discernable from the

court's continued citation of *Milos, Garvin, Globe,* and *Berry Brothers* as accurate statements of the law.

17. Easy definitions of the terms, "primary area of responsibility" and "plus territory," eluded counsel in both their briefs and at oral argument. Defense counsel characterized the former as "where a dealer may locate his dealership." Included in the term, however, is the idea that to promote sales and assure adequate service to customers within a populated or heavily travelled area, Pontiac has determined that one or more dealers must conduct his business there. While the dealer is in no way precluded from selling vehicles to those who live elsewhere, or providing service for them, he cannot move his facilities outside that particular area—and, in fact, can only move his business to another site within the area after receiving Pontiac's permission.

which plaintiff was to acquire upon becoming a metropolitan dealer. Plaintiff contends that defendant knew that (1) the designation of "plus" territory was illusory; (2) the inclusion of "plus" communities was material, and did in fact influence the plaintiff to become a metropolitan dealer; and (3) the plaintiff neither would nor could know the true meaning of the term "plus" territory. After a careful review of the documents before the court, I conclude that plaintiff has failed to establish any material factual issue respecting his allegation of fraud.

The primary area of responsibility assigned to Wamsley Pontiac in 1956 included, among other communities in Bucks County, Pennsylvania, Fairless Hills and Yardley. Fairless Hills and Yardley were retained in plaintiff's primary area under the 1962 dealer-selling agreement between the parties. Under the 1963 modification of that agreement concomitant with plaintiff's inclusion in the Trenton Metropolitan Area, however, those two communities were contained in the area described as "plus the following communities." The 1965 dealer selling agreement incorporated the 1963 modification. In a letter in March, 1970, from John P. Ware, then Philadelphia zone manager for Pontiac, to plaintiff, the portion of Bucks County which had been included in the Trenton Metropolitan Area under the 1965 agreement, specifically only the borough of Morrisville, was enlarged to cover the Lincoln Point site upon which plaintiff claimed to have possessed an option. The 1970 dealer selling agreement presently in force retains this provision.

Plaintiff argues that the redefinition of his primary area of responsibility in 1963, in light of Pontiac's promise to give him "additional territory and responsibility" if he agreed to inclusion within the Trenton Metropolitan Area, constituted a false misrepresentation giving rise to damages. Even a cursory comparison of the 1962 and 1963 agreements demonstrates the fallacy of this argument. Under the 1963 agreement plaintiff's primary area of responsibility —notwithstanding the change in status of Fairless Hills and Yardley—was vastly enlarged; it included the City of Trenton, Ewing and Hamilton Township, and a portion of Lawrence Township, all in Mercer County, New Jersey; the City of Bordentown, the borough of Fieldsboro and Bordentown Township and all unincorporated communities therein, in Burlington County, New Jersey; and the borough of Morrisville, Bucks County, Pennsylvania. In addition to Fairless Hills and Yardley, Robinsville in Mercer County, New Jersey, and Columbus and Crosswicks, in Burlington County, New Jersey, were designated as "plus" communities.

■■■ Although conceding that he could still continue to sell automobiles to anyone residing in Fairless Hills and Yardley, plaintiff nevertheless asserts that the characterization of those communities as "plus" territory was an emasculation of his Pennsylvania territory, depriving him of certain unspecified rights he had when those communities were within his primary area of responsibility. The change in designation, plaintiff contends, delayed his relocation in Lincoln Point, since that was located in "plus" territory until he had lost his option on that site. Plaintiff's contention, although possibly correct,[18] is irrel-

---

"Plus territory," on the other hand, seems to designate one or more adjacent communities. Because such territories are less heavily travelled and more sparsely populated, they are considered unable to support their own dealerships, and accordingly, no dealer may locate therein.

18. Plaintiff's request to locate at Lincoln Point, made in March, 1969, was not ap-

proved until January 1970, some ten months later. Lincoln Point was added to the Trenton Metropolitan Area in March, 1970. However, since *the written approval of Pontiac was a prerequisite to any relocation, whether within or without his primary area of responsibility*, it is doubtful that Lincoln Point's location significantly affected the time factor.

evant to and establishes no evidence of fraud. Plaintiff has produced not a scintilla of evidence to substantiate his claims that he was deceived as to the meaning of the term "plus" communities or indeed that he even bothered to ascertain its meaning. Indeed, his free and willing assent to the dealer selling agreements of 1963, 1965, and 1970, under which he obtained the benefits of a metropolitan dealership for Pontiac, including the goodwill value of its very name, may operate as an estoppel to his present attack upon those agreements. Cf. *Tempo Music, Inc. v. Myers,* 407 F. 2d 503, 507 (4th Cir. 1969) ; *Marshall v. Mole Constructors,* 193 F.Supp. 617, 618 (W.D.Pa.1961). Plaintiff's claim of fraud therefore cannot defeat Pontiac's motion for summary judgment.

Accordingly, for all the foregoing reasons, plaintiff's motion for summary judgment must be denied and defendant's motion for summary judgment must be granted.

In any event, Langhorne, where plaintiff doggedly proposed to relocate, was well outside the Yardley-Fairless Hills area, whether the latter be deemed to be within his primary area of responsibility, as it was before 1963, or "plus" territory.