TUNIS BROTHERS COMPANY, INC.,
Richard N. de la Rigaudiere, and
David C. Smith

v.

FORD MOTOR COMPANY, Ford Motor
Credit Company, Wenner Ford Tractor,
Inc., John S. Wenner, John Watson,
Douglas N. Crawford, Eugene W. Frah-
er, E.S. Hasel, Hugh Nickel, and Ken-
neth E. Harris.

Civ. A. No. 82–5557.

United States District Court,
E.D. Pennsylvania.

May 7, 1984.

Arnold R. Ginsburg, Haverford, Pa., for plaintiffs.

Robert C. Heim, Jeffrey G. Weil, Linda J. Wharton, Philadelphia, Pa., for Ford Motor Co., Ford Motor Credit, Watson, Crawford, Fraher, Hasel, Nickel and Harris.

Steven T. Stern, Philadelphia, Pa., for Wenner Ford Tractor, Inc. and John S. Wenner.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This action involves federal antitrust claims and pendent state law claims. Presently before the court are defendants' two motions for summary judgment.[1] For the reasons stated herein, the motions for summary judgment will be granted on the antitrust claims and the remaining state law claims will be dismissed without prejudice.

### I. FACTS

In order that there be a better understanding of this case, a brief review of the facts and relationships of the parties is necessary. In 1959, plaintiff Tunis Brothers Company, Inc. ("Tunis Brothers"), located in Kennett Square, Pennsylvania, became a Ford Motor Company ("Ford") fran-

---

1. One of the two motions for summary judgment has been filed by all defendants except Wenner Ford Tractor, Inc. and John S. Wenner.

The other motion for summary judgment has been filed by defendants Wenner Ford Tractor, Inc. and John S. Wenner.

chised dealership selling tractors.[2] The dealership was owned and operated by Richard and Isabelle Tunis.[3] In March 1980, Richard Tunis was approached by plaintiffs Richard N. de la Rigaudiere ("de la Rigaudiere") and David C. Smith ("Smith") in their attempt to buy the business. Eventually, sometime in late 1980, Richard and Isabelle Tunis agreed to sell the business to de la Rigaudiere and Smith.

In May 1981, prior to the sale of the business, de la Rigaudiere and Smith met with defendant John Watson ("Watson"), a zone manager for Ford, for the purpose of discussing the transfer of the Ford franchise to them once Richard and Isabelle Tunis sold the business. The parties met at Wenner Ford Tractor, Inc. ("Wenner Ford"). Wenner Ford is the Ford tractor dealership nearest to Tunis Brothers and has as its president and chief executive, defendant John S. Wenner ("Wenner").[4] During the meeting, which included lunch at the Concordville Inn, Watson indicated that Ford did not intend to have a franchised dealership selling tractors in Kennett Square after Tunis Brothers was sold but rather, was interested in having a franchised dealership in the Cochranville/Oxford area 15 miles west of Kennett Square.

Later, in June 1980, plaintiffs de la Rigaudiere and Smith met with Watson's supervisors, defendant Eugene W. Fraher ("Fraher") and his associate, Edward Poole, in Cohoes, New York. At that time Fraher was District Manager for the Northeastern District of Ford Tractor Division. At the meeting Fraher confirmed what plaintiffs had been told regarding Ford's plan to eliminate its Kennett Square franchise once Tunis Brothers was sold. Despite this, plaintiffs were asked to submit financial information and a business plan containing their proposals for operating a franchised dealership.

On December 16, 1980, Richard and Isabelle Tunis and de la Rigaudiere and Smith signed an Agreement of Sale for Tunis Brothers. Performance of the agreement was not conditioned on plaintiffs obtaining Ford's approval to continue the Tunis Brothers dealership as a Ford franchised dealership. In early 1981 plaintiffs sent to Ford the plan requested by Fraher during the June 1980 meeting. On March 3, 1981, defendants Hugh Nickel ("Nickel") and Douglas N. Crawford ("Crawford"), both employees of Ford, met with de la Rigaudiere and Smith in Kennett Square to obtain more application information for: 1) a franchised dealership; and 2) credit from defendant Ford Motor Credit Company ("Ford Credit").

The closing of the sale of Tunis Brothers took place on March 13, 1981. By letter dated March 17, 1981, Richard Tunis sent Ford his letter of resignation. Defendant Kenneth E. Harris ("Harris"), Market Representative Manager of the Northern Region of Ford Motor Company's Tractor Division, did not process the resignation letter, but rather, held the resignation pending a decision on plaintiffs' applications.

In May 1981, de la Rigaudiere and Smith were informed that their credit application had not been approved by Ford Credit. However, since the decision had been based

---

**2.** In addition to selling Ford tractors, Tunis Brothers sold Ford accessories and non-Ford products. For the period of time from 1977 to 1981, Tunis Brothers' sales of Ford products as compared with its total sales ranged from a high of 65.8% in 1979 to a low of 46.2% in 1981. *See* Plaintiffs' Amended Answers to Defendant Ford Motor Company's Interrogatories; Plaintiffs' Trial Exhibit P–102.

**3.** A 1974 franchise agreement between Ford and Richard and Isabelle Tunis remained in effect, without interruption, and governed the parties' relationship after 1974.

**4.** Wenner Ford is a participant in Ford's Dealer Development program. This program permits Ford and another party to invest in a dealership with the understanding that the other party will buy out Ford's investment within a reasonable time and thus become a privately capitalized dealer. The terms of the Dealer Development Agreement in this case included, *inter alia,* that Ford would be the sole preferred stock shareholder of Wenner Ford and that John Wenner would be the sole common stock shareholder. Only the preferred shares are capable of being voted under terms of the Agreement. *See* Plaintiffs' Trial Exhibits P–163, 164.

**270**

on erroneous financial information, plaintiffs were permitted to submit a new credit application to Ford Credit. By letter dated August 7, 1981, defendant E.S. Hasel ("Hasel"), Regional Manager of the Northern Region of Ford Motor Company's Tractor Division, advised de la Rigaudiere and Smith that Ford would not approve their application for a franchised dealership in Kennett Square. Subsequently, plaintiffs became, and still are, an Allis-Chalmers dealership selling Allis-Chalmers tractors at Tunis Brothers.

On December 2, 1982, plaintiffs Tunis Brothers, de la Rigaudiere and Smith filed a complaint in this court. The plaintiffs' claims, as discussed below, are based on section 1 of the Sherman Act and state law.

Counts I through IV are based on the federal antitrust laws. More specifically, Counts I, III and IV are based on an alleged conspiracy under section 1 of the Sherman Act. In these counts plaintiffs allege that all the defendants conspired for the purposes of terminating Tunis Brothers as a Ford franchised dealership and preventing plaintiffs de la Rigaudiere and Smith, as new owners of Tunis Brothers, from operating their dealership as a Ford franchised dealership (hereinafter referred to as the "conspiracy").[5] The conspiracy, plaintiffs claim, was formed with the intent to eliminate or substantially decrease competition with defendant Wenner Ford.

Count II is also based on section 1 of the Sherman Act. In this count, however, plaintiffs do not allege the existence of a conspiracy but rather contend that a 1974 franchise agreement between Ford and Tunis Brothers which governed the parties' relationship after 1974 was a contract in unreasonable restraint of trade or commerce.

Count V and VI are state law claims over which this court has pendent jurisdiction. In Count V plaintiffs allege a number of different theories upon which they claim defendants are liable. As plaintiffs have stated, Count V of the complaint is "based upon fraud and other tortious conduct."[6] Count VI is a contract claim in which plaintiffs allege that Ford breached the franchise agreement and that all the other defendants aided or abetted Ford in breaching the franchise agreement.

## II. SUMMARY JUDGMENT

In ruling on defendants' motions for summary judgment, this court is aware that summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. Additionally, this court is aware that due to the complexity of many antitrust cases summary judgment is used sparingly in such cases. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Nevertheless, summary judgment, if otherwise justified, is clearly appropriate in antitrust cases. *See International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

### A) *Counts I, III and IV*

Counts I, III and IV of the complaint are based on alleged violations of section 1 of the Sherman Act. The basic principles which guide this court in determining whether a violation of section 1 of the Sherman Act has occurred have been articulated by the Third Circuit Court of Appeals.

In order to sustain a cause of action under § 1 of the Sherman Act, the plain-

---

**5.** A fair reading of Counts I, III and IV reveals the following distinctions among these counts. Count I sets forth a *per se* violation of section 1 of the Sherman Act and is based on the alleged conspiratorial conduct of defendants. Count III of the complaint is the same as Count I except for the additional allegation that defendants' conspiracy included "dirty business tricks and unfair business dealings." Count IV is the same as Count I with the exception that in Count IV

plaintiffs do not allege a *per se* violation of section 1 of the Sherman Act but rather, allege that defendants' conspiratorial conduct violated the rule of reason.

**6.** Plaintiffs' response to defendants' motions for summary judgment p. 13; Transcript of February 8, 1984 hearing on motions for summary judgment, Tr. 45–46.

tiff must prove: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

Unless the particular restraint falls within a category that has been judicially determined to be illegal per se, the legality of a restraint challenged under § 1 of the Sherman Act must be assessed under the rule of reason. Under the rule of reason standard, only those restraints upon interstate commerce which are unreasonable are proscribed by § 1 of the Sherman Act.

*Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81–82 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978) (citations omitted).

Since Counts I, III and IV are all premised on the existence of a conspiracy, despite any differences among these counts,[7] in order to succeed on any of these three counts plaintiffs must show that a conspiracy within the meaning of section 1 occurred.

■ In determining whether plaintiffs have satisfied the burden of producing sufficient evidence of a section 1 conspiracy, it is not required that plaintiffs present direct proof of the conspiracy. On the contrary, plaintiffs may rely on inferences drawn from circumstantial evidence. *See Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir.1980). The latitude with respect to what inferences are permissible from the circumstances is broad, *see, e.g. Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 223–28, 59 S.Ct. 467, 472–75, 83 L.Ed. 610 (1939), but not limitless. There are limits beyond which reasonable inference-drawing degenerates into groundless speculation. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 304 (3d Cir.1983). Additionally, in examining the proposed evidence of an antitrust conspiracy, courts have been warned against fragmentizing or compartmentalizing the evidence. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 698–699, 82 S.Ct. 1404, 1409–1410, 8 L.Ed.2d 777 (1962); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1253 (3d Cir.1975). With these guidelines in mind, the court examines plaintiffs' allegations of a conspiracy to determine if there is evidence of a "meeting of the minds," *see American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946), and if so, to whom the minds belong.

■ The defendants who allegedly conspired are Ford, Ford Credit, John Wenner, Wenner Ford, and a number of individuals who are or were employees of Ford.[8] At the outset it should be noted that both John Wenner and the individual Ford employees are incapable of conspiring with their respective corporations and that the Ford employees are incapable of conspiring among themselves to the extent they are acting on Ford's behalf. *See, e.g., Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 894 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); II E. Kintner *Federal Antitrust Law* § 9.8 (1980). Thus, any acts between Ford and its employees or between John Wenner and Wenner Ford cannot be used to show that two or more persons or entities conspired, within the meaning of section 1 of the Sherman Act, to terminate Tunis Brothers or deny the

---

7. *See* note 5 *supra.*

8. By Order dated June 22, 1983, this court dismissed all claims against another named defendant, C.W. Wenzel, for lack of personal jurisdiction. *Tunis Brothers Co., Inc. v. Ford Motor Co.,*No. 82–5557 (E.D.Pa. June 22, 1983).

transfer of the Ford franchise to de la Rigaudiere and Smith.[9]

### (i) *Ford Credit*

There is no evidence whatsoever from which this court could infer that Ford Credit conspired with John Wenner or Wenner Ford. Therefore, in their attempt to show that Ford Credit was a party to the overall conspiracy plaintiffs attempt to show a conspiracy between Ford and Ford Credit. They attempt to do so by producing evidence of a conversation between defendant Nickel, a Ford employee, and Howard Stonebeck, Branch Manager of Ford Credit's Philadelphia branch office.[10]

The evidence of the conversation is a written entry in a chronology of events covering the first credit application submitted to Ford Credit. The relevant entry refers to a phone conversation between Stonebeck and Nickel during which they discussed certain financial information on plaintiffs' application, specifically, the amount of capital de la Rigaudiere and Smith were intending to invest in the dealership. The entry indicates that as a result of the conversation Stonebeck had the impression that Ford did not want the application approved.[11]

While such evidence may be probative of Ford's intention to deny the franchise application of plaintiffs, it is not probative of Ford Credit's participation in any type of agreement. Neither this evidence, the fact that Ford Credit did not approve plaintiffs' first credit application,[12] nor any permissible inference which could be drawn from this evidence, warrants a finding that Ford Credit and Ford "had a unity of purpose or a common design and understanding...." *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1345 (3d Cir.1975) (citations omitted).

■ Since there is no evidence that Ford Credit conspired with either John Wenner or Wenner Ford and since this court has determined that the facts do not justifiably permit an inference of a conspiracy between Ford Credit and Ford,[13] Ford Credit cannot be liable as a co-conspirator under section 1 of the Sherman Act.

### (ii) *John Wenner*

■ Plaintiffs claim that John Wenner was a member of the conspiracy "from the very beginning ... through a tacit agreement."[14] However, the evidence plaintiffs rely upon in opposing defendants' motions for summary judgment, taken as a whole, fails to show that John Wenner was ever a party to a conspiracy to terminate Tunis Brothers or deny de la Rigaudiere and Smith a Ford franchise.[15]

---

9. This rule prohibiting a conspiracy from being based on acts between a corporation and its employees does not, of course, preclude a conspiracy predicated on acts by the employees and some non-employee or entity other than their own corporation. Thus, for example, it is possible that a conspiracy could be formed between John Wenner and a Ford employee.

10. Plaintiffs contend that this conversation is their principal evidence of Ford Credit's conspiratorial behavior (Tr. 49). The court determines that this is the only evidence which purportedly shows Ford Credit's participation in the alleged conspiracy.

11. Saxton Deposition, pp. 23–24; Plaintiffs' Trial Exhibit P–73.

12. Although the first credit application submitted by de la Rigaudiere and Smith was denied, plaintiffs were permitted to submit a second application when it was determined that the

first credit application had contained erroneous financial information. This second credit application was still pending with Ford Credit when Ford, through defendant Hasel, notified de la Rigaudiere and Smith that they would not be given a Ford tractor franchise in Kennett Square.

13. The court also finds that there is no evidence which would support a finding that a Ford employee, but not acting on behalf of Ford, conspired with Ford Credit.

14. *See* Tr. 28.

15. In determining whether a section 1 conspiracy exists between Ford and John Wenner or Wenner Ford, the court is guided by the recent Supreme Court decision *Monsanto Company v. Spray-Rite Service Corporation,* —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). In that distributor-termination case, the court held that in order to submit a section 1 claim to the jury,

The facts upon which plaintiffs base their claim that John Wenner tacitly agreed to be a co-conspirator are as follows: (1) a memorandum written in August 1981 by Ford employees in which there is a reference to an attempt to find out if any commitment regarding the Kennett Square area had been made to Wenner;[16] (2) John Wenner was present in the same restaurant when de la Rigaudiere and Smith met with defendant Watson to discuss the possibility of acquiring the Kennett Square Ford franchise after the sale of Tunis Brothers; (3) John Wenner, as expressed by plaintiffs' counsel, "seemed to know" before plaintiffs that plaintiffs' franchise application was going to be rejected;[17] (4) John Wenner is a friend of many of the Ford employee defendants; (5) Tunis Brothers was the only Ford tractor dealership in the Kennett Square area other than Wenner Ford and thus was John Wenner's only competition.[18]

Viewed together and in a light most favorable to plaintiffs, these facts do not permit a reasonable inference to be drawn which would place John Wenner in an agreement with any other defendant to terminate Tunis Brothers or deny the transfer of the Ford franchise to de la Rigaudiere and Smith. The facts presented do not warrant a finding that John Wenner was a member of a conspiracy since they do not show, directly or indirectly, a "meeting of the minds" between John Wenner and any of the other defendants. To hold differently would permit a party to use speculation as evidence of participation in an antitrust conspiracy. *See In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d at 304 (3d Cir.1983). Because there is simply no evidence, direct or circumstantial, which indicates that John Wenner was a party to the alleged conspiracy, John Wenner cannot be liable under Counts I, III and IV.

### (iii) *Wenner Ford*

Due to the fact that a corporation has no way of acting except through officers and employees, in order for Wenner Ford to be a member of the alleged conspiracy, the facts must indicate or permit a reasonable inference that an employee or officer of Wenner Ford, on behalf of Wenner Ford, agreed with at least one other person or entity to commit the acts complained of by plaintiffs. As seen above, plaintiffs have failed to present sufficient evidence from which this court could infer that John Wenner was a party to the alleged conspiracy. Based on this failure, and on the fact that plaintiffs have not presented any evidence that any other employee of Wenner Ford was a party to the conspiracy, it would normally follow that Wenner Ford could not be a member of the alleged conspiracy. However, in this case, two Ford employees, defendants Fraher and Hasel, have also served, at some time, as directors and officers of Wenner Ford.[19] Because of Fraher's and Hasel's dual employment capacities it is necessary to examine the possibility as to whether Wenner Ford was party to the alleged conspiracy through the acts of Fraher and Hasel.

---

more than evidence of complaints from other distributors is needed. *Id.* 104 S.Ct. at 1470. The evidence presented must tend to exclude the possibility that the manufacturer and non-terminated distributors were acting independently. *Id.*

**16.** *See* Tr. 28–29; Plaintiffs' Trial Exhibit P–62.

**17.** Tr. 31.

**18.** In addition to these facts that are virtually all subjective, intangible or ambiguous, plaintiffs also cite the unambiguous fact that one of Wenner Ford's trucks was used in an attempt to repossess a Ford tractor from plaintiffs' dealership. However, even plaintiffs apparently concede that this incident is of little value in implicating Wenner in the alleged conspiracy. *See* Tr. 28–33.

**19.** Although plaintiffs repeatedly note in the papers filed with the court that a number of Ford employees have simultaneously served as employees of Wenner Ford and Ford, plaintiffs only specifically refer to defendants Fraher and Hasel. Therefore, the court will examine the activities of only these two defendants as they relate to the alleged participation by Wenner Ford in the conspiracy. Fraher's and Hasel's involvement as directors and officers of Wenner Ford arises out of the terms of the Dealer Development Agreement in which Wenner Ford was a participant. *See* note 3 *supra*.

■ While it is true that a conspiracy between corporations might arise if directors, officers, representatives or other employees are working for two or more entities, *see Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Tamaron Distrib. Corp. v. Weiner*, 418 F.2d 137 (7th Cir. 1969); *America's Best Cinema Corp. v. Fort Wayne Newspapers, Inc.*, 347 F.Supp. 328 (N.D.Ind.1972), such reasoning is based on the premise that the employees are working on behalf of those corporations. In this case the facts plaintiffs have presented in support of their position that Fraher and Hasel were members of the conspiracy relate solely to activities Fraher and Hasel performed as Ford employees, not as employees of Wenner Ford. There are no facts which indicate that Fraher and Hasel, while working on behalf of Wenner Ford, attempted to terminate Tunis Brothers or prevent the transfer of the Ford franchise to de la Rigaudiere and Smith. Additionally, it would be improper to impute activities performed by Fraher and Hasel in their capacities as Ford employees to Wenner Ford on the sole basis that, at some time, Fraher and Hasel had also served as directors and officers of Wenner Ford. Ford employees routinely act as directors and officers of all Dealer Development dealerships into which Ford has contributed capital. Thus, since there are no facts indicating that a person acting on behalf of Wenner Ford was a co-conspirator for purposes of terminating Tunis Brothers or denying the transfer of the Ford franchise, all counts against Wenner Ford which are based on a section 1 conspiracy under the Sherman Act must be dismissed.

### (iv) *Ford and the Ford Employees*

Having determined that the facts fail to show or give rise to a reasonable inference which shows that Ford Credit, John Wen-

ner and Wenner Ford were parties to a conspiracy, the only remaining defendants that could have been parties to the alleged conspiracy are Ford and the individual Ford employees. However, as noted previously, for purposes of section 1 of the Sherman Act a corporation and its employees, or the employees themselves on behalf of their corporation, cannot conspire.

Therefore, since there is no evidence of a conspiracy under section 1 of the Sherman Act, there is no genuine issue of material fact and all defendants are entitled to judgment as a matter of law on Counts I, III and IV. *See Kaiser v. General Motors Corp.*, 396 F.Supp. 33, 38–39 (E.D.Pa.1975), *aff'd* 530 F.2d 964 (3rd Cir.1976).

### B) *Count II*

In Count II of their complaint plaintiffs allege that the 1974 franchise agreement between Ford and Tunis Brothers was a contract in unreasonable restraint of trade due to the existence of unlawful provisions in the agreement. Plaintiffs contend that the contractual provisions made the franchise agreement illegal both *per se* and under the rule of reason in violation of section 1 of the Sherman Act. Plaintiffs also contend that the defendants other than Ford are liable under this count since they "... aided and abetted Ford and conspired with Ford in exercising its rights under said provisions of the agreement ... and in utilizing said contractual provisions in furtherance of illegal objectives...." [20]

Generally, the provisions in the franchise agreement which plaintiffs claim are unlawful are: 1) a provision which prevented the franchisee, i.e. Tunis Brothers, from transferring the franchise without approval of Ford; and 2) a provision which gave Ford the right to terminate the agreement. Additionally, under the franchise agreement Ford had the right to deny an application for a Ford franchise from any purchaser of the Tunis Brothers business. [21]

---

20. Complaint, ¶ 95.

21. More specifically, the actual wording of the subject provisions gave Ford the right to terminate the arrangement between it and Tunis

Brothers without notice if there was a transfer or an attempt to transfer any ownership interest in the dealership. Ford could terminate the arrangement at will provided the dealer was

It is settled law that a manufacturer is free to choose with whom he will deal absent any agreement restraining trade. *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979). A refusal to deal, whether it be a dealership termination or a rejection of an application for a dealership, is not a violation of section 1 of the Sherman Act unless the refusal is a result of collusive action between two or more distinct entities. *See Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870 (9th Cir.1982); *Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir.1972); *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093 (3d Cir.1972). Application of these principles to the franchise agreement and the provisions contained therein requires this court to find that the franchise agreement, on its face, does not violate section 1 of the Sherman Act. *See Kaiser v. General Motors Corp.*, 396 F.Supp. 33, 39 (E.D.Pa. 1975), *aff'd*, 530 F.2d 964 (3d Cir.1976). The court also determines that there are no facts which show that Ford improperly used the franchise agreement to deny transfer of the Ford franchise to plaintiffs de la Rigaudiere and Smith. *See Salco Corp. v. General Motors Corp., Buick Motor Div.*, 517 F.2d 567, 576 (10th Cir.1975). Accordingly, defendants' motions for summary judgment as to Count II will be granted.

### C) *Counts V and VI*

Counts V and VI are state law claims over which this court has pendent jurisdiction. In situations where a court dismisses all federal claims before trial, as in this case, it is discretionary with the court to proceed with the pendent claims. *See United Mine Workers of America v.*

given at least sixty (60) days prior written notice. The franchise agreement also provided that any change in an ownership interest would be ineffective against Ford and that Ford could

*Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Rogers v. Valentine*, 426 F.2d 1361 (2nd. Cir.1970). The court will dismiss the pendent claims, Counts V and VI, without prejudice. *See Broderick v. Associated Hosp. Serv. of Philadelphia*, 536 F.2d 1, 8 n. 25 (3d Cir.1976); *Daley v. St. Agnes Hospital, Inc.*, 490 F.Supp. 1309, 1320 (E.D.Pa.1980).

### III. CONCLUSION

Since there is no genuine issue as to a material fact in Counts I, II, III and IV, and defendants are entitled to a judgment as a matter of law on those counts, defendants' motions for summary judgment will be granted with respect to Counts I, II, III and IV. The remaining pendent claims, Counts V and VI, will be dismissed without prejudice.

An appropriate Order will be entered.

decline to appoint as an authorized dealer any purchaser or prospective purchaser of the dealership upon termination or non-renewal of the agreement.